UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WARE-HOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

In re APPLICATION CX OF the INDE-PENDENT ADMINISTRATOR.

No. 88 CIV. 4486 (DNE).

United States District Court,
S.D. New York.

July 13, 1993.

See also 824 F.Supp. 410.

Charles M. Carberry, Investigations Officer of the Intern. Broth. of Teamsters (Celia A. Zahner, of counsel), for Intern. Broth. of Teamsters.

Mary Jo White, U.S. Atty. for the S.D.N.Y. (Steven C. Bennett, Asst. U.S. Atty., of counsel), for U.S.

Franzblau, Dratch & Friedman, P.C., Roseland, NJ (S.M. Chris Franzblau, Julian Wilsey, of counsel), for Arnold Ross.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by the plaintiff United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The Consent Decree provides for three Court-appointed officials: the Independent Administrator to oversee the Consent

Decree's remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer, who supervised the electoral process that culminated in the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the electoral and disciplinary provisions.

Application CX presents for this Court's review the decision of the Independent Administrator regarding disciplinary charges brought by the Investigations Officer against Mr. Arnold Ross, ("respondent"), the President IBT Local Union 97, which is located in Newark, New Jersey. The Independent Administrator found that Mr. Ross brought reproach upon the IBT by failing to investigate and act when confronted with allegations that Mr. John "John the Greek" Agathos,[1] an organizer and trustee for Local 97, had engaged in criminal activity and other wrongful conduct. The Independent Administrator also found that Mr. Ross violated the IBT Constitution and Local 97's Bylaws when Mr. Ross caused Local 97 to pay his and Mr. Agathos' legal fees in connection with a Department of Labor ("DOL") investigation into Mr. Agathos' union activities. For these violations of the IBT Constitution, the Independent Administrator ordered Mr. Ross' removal as President of Local 97, prohibited him from drawing compensation from Local 97, and permanently barred Mr. Ross from holding any officer position, or obtaining any type of employment, with the IBT or any IBT-affiliated entity. The Independent Administrator permitted Mr. Ross to retain his IBT membership so that he can secure work, if he chooses, as a rank-and-file member with non-IBT affiliates. Furthermore, the Independent Administrator precluded IBT-affiliated entities from making contributions on respondent's behalf to employment benefit plans, whether controlled by IBT-affiliates or third-parties, although the Independent Administrator did not alienate his vested benefits. Finally, the Independent Administrator

prohibited any IBT-affiliated entity from paying Mr. Ross' legal expenses. The Independent Administrator stayed the imposition of penalties pending this Court's review.

Mr. Ross contends that the Independent Administrator's decision is arbitrary and capricious because it is not supported by substantial evidence. Respondent also argues that the penalties imposed are disproportionate to the conduct charged. These arguments are without merit. The decision of the Independent Administrator is fully supported by the evidence. For the reasons stated below, the decision of the Independent Administrator is affirmed.

## I. BACKGROUND: INDEPENDENT ADMINISTRATOR'S FINDINGS

The Investigations Officer charged that Mr. Ross brought reproach upon the IBT in violation of Article II, Section 2(a) and Article XIX, Sections 7(b)(1), (2), and (3) of the IBT Constitution. Article II, Section 2(a), the IBT membership oath, provides in relevant part that every IBT member shall "conduct himself or herself at all times in such a manner as not to bring reproach upon the Union." Article XIX, Section 7(b) is a non-exhaustive list of disciplinary charges that may be filed against IBT members. Three such charges are: (1) violating the IBT Constitution, a Local Union Bylaw or other Union rule; (2) violating the IBT membership oath; and (3) breaching a fiduciary duty by embezzling or converting union funds or property. *See* IBT Const., Art. XIX, §§ 7(b)(1)–(3).

Pursuant to Section F.12(C) of the Consent Decree, the Independent Administrator must adjudicate disciplinary charges using a "just cause" standard. The Investigations Officer has the burden of establishing just cause by a preponderance of the evidence. December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990). After conducting a hearing (the "hearing") at which Mr. Ross was represented by counsel, and after receiving post-hearing submissions, the Indepen-

---

1. The Investigations Officer has filed charges against Mr. Agathos for knowingly associating with members of La Cosa Nostra and for engaging in dual unionism. These charges remain unresolved due to Mr. Agathos' claimed ill-health. (Decision of the Independent Administrator at 5 & n. 3).

dent Administrator issued a thirty-page decision. The Independent Administrator found that the Investigations Officer satisfied his burden of proving that respondent brought reproach upon the Union by failing to investigate allegations that Mr. Agathos engaged in wrongful conduct, and by improperly causing Local 97 to pay his and Mr. Agathos' legal fees. (Decision of the Independent Administrator ("Ind.Admin.Dec.") at 1, 14).

### A. Mr. Ross' Failure to Investigate Allegations of Mr. Agathos' Wrongdoing

#### 1. Mr. Agathos' Assault Conviction

The Independent Administrator found that Mr. Ross' relationship with Mr. Agathos began in the late 1970's, when they met at a Joint Council meeting. At that time, Mr. Agathos was Secretary–Treasurer of IBT Local 966, located in New York City. In response to a request from Mr. Agathos in early 1984, Mr. Ross hired Mr. Agathos as a Local 97 organizer. Two factors allegedly motivated Mr. Ross' decision to hire Mr. Agathos: He believed that he "owed" Mr. Agathos, who had assisted in effectuating a merger between Local 97 and IBT Local 286, which increased Local 97's membership, and he believed that Mr. Agathos would make a good organizer. *Respondent's Legal Memorandum in Opposition to Application by Independent Administrator Seeking Review and Affirmation of Decision* ("Respondent's Memorandum"), at 2–3. From the time of his hiring, Mr. Agathos reported directly to Mr. Ross "ninety-nine percent of the time." (Ind.Admin.Dec. at 5). Although upon hiring Mr. Agathos, Mr. Ross did not know, and did not ask, whether Mr. Agathos was still associated with Local 966, Mr. Agathos did tell Mr. Ross of his continuing role as President of Hotel and Restaurant Employees Union ("HREU") Local 69.

In September 1984, Mr. Agathos was indicted in the United States District Court for the Southern District of Florida for assault. The incident received coverage in the press, and one newspaper reported that:

A 76–year–old man strapped into his seat was severely beaten Monday by a father and son angered in a dispute over their reclining chair backs just after their Delta Air Lines jet took off on a flight to New Jersey, according to the FBI. Witnesses said Harry Klinghoffer of Fort Lauderdale, a newspaper distributor, was struck more than 20 times by John N. Agathos, 42, and his son, John R. Agathos, both New Jersey local union officials, Knight Rider newspapers reported.... FBI spokesman Del Campo said Klinghoffer "had to have at least 20 stitches.... He was beaten severely...." An Assistant United States Attorney commented that "[a]ny time a 76–year–old man gets beaten up for no good reason—while still strapped in his seat—well, that's pretty outrageous."

(Ind.Admin.Dec. at 7–8 (quoting Washington Post, July 25, 1984)). Mr. Agathos was convicted of misdemeanor assault pursuant to 18 U.S.C. § 113(d), and sentenced to six months imprisonment. Following his release from prison, Mr. Agathos resumed employment with Local 97.

Despite admittedly having read accounts of this incident in the press, Mr. Ross "never conducted any investigation into the beating incident ... [and] did not even see fit to ask Agathos what he had done." (Ind.Admin.Dec. at 8); *see Respondent's Memorandum,* at 4. Members of Local 97's Executive Board confirmed the absence of an inquiry into this incident. Mr. Ross consulted with the Local's attorney, who reportedly told him that Mr. Agathos could return to work if convicted of a misdemeanor, but could not resume employment upon a felony conviction. (Ind.Admin.Dec. at 10).

The Independent Administrator found that Mr. Ross breached his fiduciary duty when he failed to investigate this incident, and in doing so, he violated both the membership oath of the IBT Constitution and Section 13(B) of Local 97's Bylaws, which require an investigation into a breach of fiduciary duty when "circumstances so warrant." (Ind.Admin.Dec. at 11). The Independent Administrator also concluded that the legal opinion received by Mr. Ross concerning Mr. Agathos' return to work does not insulate Mr. Ross: "[T]he issues raised by Agathos' beating of a 74–year–old man strapped to his seat

on an airplane demanded further inquiry by Ross." (Ind.Admin.Dec. at 11).

### 2. Department of Labor Investigation into Mr. Agathos' Activities

DOL conducted an investigation into whether Mr. Agathos was a "no-show" employee of Local 97, and also inquired into Mr. Agathos' relationship with HREU Local 69. Mr. Ross learned of the "no-show" prong of the investigation close to, but before, May 23, 1988, when he suggested that Local 97's Executive Board hire outside counsel in connection with the investigation. Although Mr. Agathos told Mr. Ross of his relationship with HREU Local 69, Mr. Ross did not learn that this relationship was also a focus of DOL's investigation until that probe terminated. Mr. Ross also knew that Mr. Agathos paid HREU Local 69 $3,500 to resolve DOL's claim that the Local improperly paid certain of Mr. Agathos' personal expenses. (Ind.Admin.Dec. at 14). Mr. Ross testified before a Grand Jury on June 16, 1988 in connection with DOL's investigation, at which time he refused to testify and invoked his Fifth Amendment privilege against self-incrimination. (Ind.Admin.Dec. at 12). Indeed, Mr. Ross refused to answer the following question: "Do you know John Agathos?" (Ind.Admin.Dec. at 14 n. 7). Although refusing to testify, Mr. Ross did provide the Government with documents and he also submitted to an interview with DOL. (Ind.Admin.Dec. at 12).

Despite his awareness of DOL's investigation, the Independent Administrator found that Mr. Ross "never made any independent inquiry as to whether Agathos had engaged in any wrongdoing." (Ind.Admin.Dec. at 12). Local 97's Executive Board confirmed that the issue of conducting an independent investigation never arose. (Ind.Admin.Dec. at 13). The Independent Administrator rejected Mr. Ross' contention that conducting an independent investigation would have been an exercise in repetition given the existence of DOL's probe. The Independent Administrator reasoned that although Mr. Ross knew of Mr. Agathos' ties to HREU Local 69, he did not know that DOL was investigating this relationship until the close of DOL's inquiry. In addition, Mr. Ross admittedly did not

attempt to uncover the scope of DOL's investigation. (Ind.Admin.Dec. at 13–14). Thus, "Ross' suggestion that he was simply faced with the proposition of 'duplicat[ing] the efforts [of] the federal government and grand jury,' is ... disingenuous ... [because] Ross did not even attempt to learn what the scope of those efforts were." (Ind.Admin.Dec. at 14). Accordingly, the Independent Administrator found that in failing to conduct an independent inquiry Mr. Ross breached his fiduciary duty to the general membership of Local 97.

### B. Mr. Ross' Role in Causing Local 97 to Pay Legal Fees

### 1. Payment of Mr. Ross' Legal Fees

The Investigations Officer charged Mr. Ross with improperly causing Local 97 to pay legal expenses incurred by Mr. Ross and Mr. Agathos in connection with the DOL probe. As to Mr. Ross' legal fees, the Independent Administrator found that on February 28, 1990, Local 97 issued a check to Mr. Ross' attorney in the amount of $3,500. Counsel generated these fees by representing Mr. Ross in connection with his appearance before the Grand Jury. (Ind.Admin.Dec. at 16).

The Independent Administrator found, and Mr. Ross does not dispute, that Mr. Ross failed to obtain prior approval for this payment from the general membership. Although Mr. Ross contended that he had no time to get such approval prior to paying his fees, the Independent Administrator found that "[t]here was no urgency for the payment of Ross' legal fees and approval should have waited until the next membership meeting ... [which in] this case was just a matter of two weeks." (Ind.Admin.Dec. at 17). In fact, even when this meeting was held, the general membership was not informed that the Local had paid Mr. Ross' legal fees. The Independent Administrator also rejected Mr. Ross' argument that payment prior to general membership approval was permissible because Local 97 had developed a custom of obtaining retroactive approval for expenditures from the general membership. The Independent Administrator held that "Ross misses the point. The Local's custom of

seeking approval of its bill .after they are paid does not excuse Ross' violation of a specific provision of the IBT Constitution which requires prior approval." (Ind.Admin.Dec. at 17).

The Independent Administrator concluded that Mr. Ross' conduct constitutes a violation of Local 97's Bylaws and two provisions of the IBT Constitution. Mr. Ross violated Article IX, Section 9(c) of the IBT Constitution, which the Independent Administrator interpreted as conditioning payment of an IBT trustee's attorney's fees on the general membership's approval. (Ind.Admin.Dec. at 16–17). In addition, Article XIX, Section 7(b)(3) of the IBT Constitution prohibits embezzlement or conversion of Union funds. The Independent Administrator concluded from Mr. Ross' conduct that he intended to defraud Local 97 in connection with the payment of legal fees. Finally, Local 97's Bylaws permit the Executive Board to approve payment of a trustee's legal expenses if it is "necessary or desirable to protect, or advance the interests of the" Local. (Ind.Admin.Dec. at 18). The Independent Administrator found that "[t]he interests of the Local demanded full and complete cooperation by Ross with the DOL investigation." (Ind.Admin.Dec. at 19). Given Mr. Ross' decision to invoke his constitutional privilege not to testify before the Grand Jury, payment of legal fees incurred in connection with this proceeding did not advance the Local's interests. (Ind.Admin.Dec. at 19).

*2. Payment of Mr. Agathos' Legal Fees*

The Independent Administrator found that Mr. Agathos incurred $33,377.50 in legal fees in connection with the DOL investigation. In a letter dated June 22, 1990, which was sent to both Local 97 and HREU Local 69, Mr. Agathos' attorney asserted that each local union was responsible for half the total fees, or $16,688.75. In response to the letter, Local 97's Executive Board held a special meeting on July 16, 1990 to decide whether or not to approve payment of the fees. (Ind.Admin.Dec. at 21). Upon Mr. Ross' motion, the Executive Board unanimously approved payment, which was made before the next general membership meeting on March 10, 1991. (Ind.Admin.Dec. at 21).

Two attorneys apparently consulted with Local 97 and HREU Local 69 in connection with payment of Mr. Agathos' legal expenses. Local 97's counsel advised Mr. Ross that such payment was proper if made in accordance with the IBT Constitution and the Local's Bylaws, and absent the filing of criminal charges against Mr. Agathos. (Ind.Admin.Dec. at 22). The Independent Administrator noted that the minutes of the July 16, 1990 meeting do not reflect any discussion of the opinion of Local 97's counsel. Another letter, however, was read into the record at the July 16 meeting. This letter was sent to Mr. Agathos from another attorney, Mr. Ira Drogin, who opined that HREU Local 69 and Local 97 could reimburse Mr. Agathos for legal fees because the DOL investigation did not result in an indictment and Mr. Agathos did not admit any wrongdoing. (Ind.Admin.Dec. at 22).

As with Mr. Ross' legal fees, the Independent Administrator concluded that Mr. Ross violated Article IX, Section 9(c) of the IBT Constitution by causing Local 97 to pay a portion of Mr. Agathos' fees without first receiving approval from the general membership. (Ind.Admin.Dec. at 22–23). Moreover, the Independent Administrator concluded that Mr. Ross intended to defraud the Local when he caused it to make this payment, in violation of Article XIX, Section 7(b)(3) of the IBT Constitution. (Ind.Admin.Dec. at 26). Finally, the Independent Administrator held that Mr. Ross also transgressed Section 13(A)(e) of Local 97's Bylaws, which permits the Local to reimburse an IBT member's legal fees only when doing so is in the Local's best interest. The Independent Administrator reasoned that Mr. Ross caused the Local to pay these fees without knowing, or even inquiring into, the scope of DOL's investigation into Mr. Agathos. While Mr. Ross argued that the DOL investigation did not produce an indictment, the Independent Administrator found that this does not exculpate Mr. Ross because " 'conduct that is not itself criminal can constitute a violation of the IBT Constitution.' " (Ind.Admin.Dec. at 24 (quoting February 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1182–83 (S.D.N.Y.1993)). The Independent Administrator also rejected Mr.

Ross' attempt to rely on the advice of counsel. The Independent Administrator noted that Mr. Ross did not follow Local 97's counsel's advice *in haec verba* because payment of Mr. Agathos' fees constituted a violation of the IBT Constitution and Local 97's Bylaws. (Ind.Admin.Dec. at 25). In any event, Mr. Drogin's letter does not insulate Mr. Ross because he was incorrectly advised: Mr. Drogin's letter conditions the propriety of payment on the absence of an indictment, when as just noted, even absent criminal charges Mr. Agathos' conduct could have constituted a violation of both the IBT Constitution and Local 97's Bylaws.

## II. DISCUSSION

### A. The Independent Administrator's Decision Is Supported by Sufficient Evidence

Mr. Ross argues that the Independent Administrator's decision is arbitrary and capricious. Specifically, respondent asserts that he: (1) did not breach his fiduciary obligation in connection with investigating Mr. Agathos' allegedly wrongful conduct; (2) did not violate the IBT Constitution or Local 97's Bylaws by causing Local 97 to pay his and Mr. Agathos' legal fees; and (3) received penalties disproportionate to his conduct.

In reviewing decisions of the Independent Administrator, it is well settled that the findings of the Independent Administrator "are entitled to great deference." *United States v. IBT*, 905 F.2d 610, 616 (2d Cir.1990), *aff'g* March 13, 1990 Opinion & Order, 743 F.Supp. 155 (S.D.N.Y.1990). This Court will overturn the findings of the Independent Administrator when it determines that they are, on the basis of all the evidence, "arbitrary or capricious." *United States v. IBT*, 981 F.2d 1362, 1368 (2d Cir.1992); *United States v. IBT*, 978 F.2d 68, 71 (2d Cir.1992); August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); March 13, 1990 Opinion & Order, 743 F.Supp. 155, 165 (S.D.N.Y.), *aff'd*, 905 F.2d 610 (2d Cir.1990); *see* June 22, 1993 Opinion & Order, 824 F.Supp. 410 (S.D.N.Y.1993); March 5, 1993 Opinion & Order, 817 F.Supp. 337, 341–42 (S.D.N.Y.1993); February 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1175–76 (S.D.N.Y. 1993); December 10, 1992 Opinion & Order, 808 F.Supp. 279, 281–82 (S.D.N.Y.1992); July 14 Opinion & Order, 803 F.Supp. 748, 753–55 (S.D.N.Y.1992); July 13 Opinion & Order, 803 F.Supp. 740, 745–46 (S.D.N.Y.1992); July 9, 1992 Opinion & Order, 803 F.Supp. 734, 737–38 (S.D.N.Y.1992); May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1353 (S.D.N.Y. 1992); April 27, 1992 Memorandum & Order, 791 F.Supp. 421, 425 (S.D.N.Y.1992); February 11, 1992 Memorandum & Order, 787 F.Supp. 345, 350 (S.D.N.Y.), *aff'd*, 978 F.2d 68 (2d Cir.1992); January 20, 1992 Memorandum & Order, 782 F.Supp. 256, 259 (S.D.N.Y. 1992); January 16, 1992 Memorandum & Order, 782 F.Supp. 238, 241 (S.D.N.Y.), *aff'd*, 978 F.2d 706 (2d Cir.1992); November 8, 1991 Memorandum & Order, *slip op.* at 4–5, 1991 WL 243268 (S.D.N.Y.1991); October 29, 1991 Opinion & Order, 776 F.Supp. 144, 152–53 (S.D.N.Y.1991), *aff'd*, 954 F.2d 801 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); October 25, 1991, Order, *slip op.* at 4–5 (S.D.N.Y.1991); October 24, 1991 Memorandum & Order, 777 F.Supp. 1133, 1136 (S.D.N.Y.1991), *aff'd*, 970 F.2d 1132 (2d Cir.1992); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1132 (S.D.N.Y.1991), *aff'd*, 964 F.2d 1308 (2d Cir.1992); October 11, 1991 Memorandum & Order, 777 F.Supp. 1127, 1128 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1125 (S.D.N.Y.1991); August 14, 1991 Memorandum & Order, *slip op.* at 4, 1991 WL 161084 (S.D.N.Y.1991); July 31, 1991 Memorandum & Order, *slip op.* at 3–4, 1991 WL 150226 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); July 18, 1991 Memorandum & Order, *slip op.* at 3–4, 1991 WL 136030 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); July 16, 1991 Opinion & Order, *slip op.* at 3–4, 1991 WL 136029 (S.D.N.Y.1991); June 6, 1991 Opinion & Order, 775 F.Supp. 90, 93 (S.D.N.Y.), *aff'd in relevant part*, 948 F.2d 1278 (2d Cir.1991); May 13, 1991 Memorandum & Order, 764 F.Supp. 817, 820–21 (S.D.N.Y.1991); May 9, 1991 Memorandum & Order, 764 F.Supp. 797, 800 (S.D.N.Y.1991) *aff'd*, 956 F.2d 1161

(2d Cir.1992); May 6, 1991 Opinion & Order, 764 F.Supp. 787, 789 (S.D.N.Y.), *aff'd,* 940 F.2d 648 (2d Cir.),· *cert. denied,* —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191–92 (S.D.N.Y.1990); January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1045–57 (S.D.N.Y.), *aff'd,* 907 F.2d 277 (2d Cir.1990).

### 1. Failure to Investigate Allegations of Mr. Agathos' Wrongdoing

#### a. Mr. Agathos' Assault Conviction

The Independent Administrator found that Mr. Ross breached his fiduciary duty when he failed to investigate the circumstances surrounding Mr. Agathos' conviction, and in doing so, Mr. Ross violated both the membership oath of the IBT Constitution and Section 13(B) of Local 97's Bylaws, which require an investigation into a breach of fiduciary duty when "circumstances so warrant." (Ind.Admin.Dec. at 11). Mr. Ross acknowledges that he did not conduct an investigation into the circumstances surrounding Mr. Agathos' conviction. Moreover, it is undisputed that respondent knew of Mr. Agathos' conviction, although respondent's counsel contests just how many press reports Mr. Ross read on the subject. *Respondent's Memorandum,* at 11–12. Instead, Mr. Ross proffers that he did not have a duty to investigate the allegations, which involved a "minor incident, which would not have barred Agathos from holding union office" under the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401, *et seq.; Respondent's Memorandum,* at 11.

█ It is clear, however, that Mr. Ross had a duty to investigate the allegations. As a threshold matter, the Independent Administrator is empowered to find that the failure to investigate allegations that a fellow union member committed criminal assault brings reproach upon the Union. The Independent Administrator's authority to interpret the IBT Constitution is beyond reasonable dispute. The Consent Decree grants the Independent Administrator the disciplinary authority of the IBT General President and the GEB. *See* Consent Decree, § F.12(A). In

interpreting this provision, the Second Circuit has held that "the [Independent] Administrator's comprehensive right to review disciplinary charges of the GEB necessarily includes the final authority to determine what constitutes an offense subject to discipline under the IBT Constitution." *United States v. IBT,* 905 F.2d 610, 619 (2d Cir.1990); *see* February 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1181 (S.D.N.Y.1993); March 13, 1990 Opinion & Order, 743 F.Supp. 155, 163–64 (S.D.N.Y.1990). In this case, the Independent Administrator has concluded that allegations of criminal assault merit an investigation, and that Mr. Ross' failure to conduct such an investigation brought reproach upon the Union. This is a reasonable basis upon which to discipline IBT members, and one which the Independent Administrator could choose to rely upon given that he possesses final authority to interpret the IBT Constitution.

█ In addition, this Court agrees with the Independent Administrator that respondent had a duty to investigate the circumstances surrounding Mr. Agathos' criminal conviction. As this Court has noted, " '[e]ach IBT ... officer is a fiduciary with respect to the Union members.' As a fiduciary, an IBT officer enjoys the trust of the general membership. In exchange for this privilege, each officer is bound to serve the membership's interests." May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1353 (S.D.N.Y.) (quoting March 6, 1989 Opinion & Order, 708 F.Supp. 1388, 1401 (S.D.N.Y.1989)), *aff'd,* 981 F.2d 1362 (2d Cir.1992). As the Independent Administrator found, investigating the assault would have been in the membership's interest. The Second Circuit has characterized a charge of assault as a "serious charge." *United States v. IBT,* 970 F.2d 1132, 1137 (2d Cir.1992). Indeed, this Court has upheld significant disciplinary sanctions against IBT members who have committed assault. *See, e.g.,* January 20, 1992 Memorandum & Order, 782 F.Supp. 256, 260 (S.D.N.Y.1992); October 24 1991 Opinion & Order, 777 F.Supp. 1133 (S.D.N.Y.1991), *aff'd,* 970 F.2d 1132 (2d Cir.1992). That Mr. Agathos assaulted an individual unaffiliated with the IBT does not undermine the principle that criminal assault

is a serious crime. It is clear, in fact, that non-IBT wrongdoing can bring reproach upon the IBT. The Second Circuit has held, for instance, that "the conviction of ... an officer of an IBT Local in connection with a scheme to embezzle the funds of a non-IBT labor union, brought reproach upon the IBT." *United States v. IBT*, 905 F.2d 610, 623 (2d Cir.1990). Despite respondent's protestations, this Court agrees with the Independent Administrator that when a Local Union trustee is alleged to have committed assault, the President of the Local is duty bound to undertake a meaningful inquiry. In admittedly failing to probe the circumstances surrounding Mr. Agathos' conviction, Mr. Ross abdicated his fiduciary responsibilities.

Furthermore, Mr. Ross' duty to investigate is not diminished or cancelled out merely because Mr. Agathos was convicted of a misdemeanor rather than a felony. Even if following his conviction Mr. Agathos could work for Local 97 under the LMRDA,[2] Mr. Ross' duty to the rank-and-file demanded that he conduct an investigation in order to determine the *desirability* of retaining Mr. Agathos. *See, e.g.*, February 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1182 (S.D.N.Y. 1993) ("It does not require a quantum leap of cognition to conclude that, absent a countervailing explanation, hiring individuals with criminal backgrounds can at times be inconsistent with a commitment to cleanse the IBT of corrupt influences."). The Independent Administrator correctly concluded that the LMRDA, and the advice of Local 97's counsel concerning the LMRDA, does not absolve Mr. Ross because "the issues raised by Agathos' beating of a 74–year–old man strapped to his seat on an airplane demanded further inquiry." (Ind.Admin.Dec. at 11).

### b. Failure to Investigate Circumstances Surrounding DOL Probe

■ Similarly, the Independent Administrator found that Mr. Ross breached his fiduciary duty, and thus violated the IBT Constitution and Local 97's Bylaws, by failing to investigate the circumstances surrounding DOL's probe into Mr. Agathos' union activi-

ties. Respondent acknowledges that he did not conduct an independent investigation of Mr. Agathos' conduct once he learned of the DOL investigation. Mr. Ross asserts that he had no duty to conduct such an inquiry, which, given the existence of the federal probe, would have been an exercise in futility.

If accepted, Mr. Ross' argument would create a safe haven for IBT officers, allowing them to remain idle and complacent any time the Government investigates an IBT member. Unlike the Government, however, Mr. Ross is the elected President of an IBT Local, and because he is privileged to occupy such a position, he is obligated to investigate charges of wrongdoing on the part of fellow officers. As the Independent Administrator has noted in another context, if Mr. Ross' " 'failure to act ... is accepted as the norm, nothing short of repeated intervention, whether it be by the government or the Court-appointed officers, would suffice to' " check the improper behavior of IBT officers, trustees and members. May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1355 (S.D.N.Y.) (quoting Decision of the Independent Administrator in the Matter of Robert Sansone, at 18), *aff'd*, 981 F.2d 1362 (2d Cir.1992); *see also* July 13, 1992 Opinion & Order, 803 F.Supp. 740, 748 (S.D.N.Y.1992) ("The conduct of third parties, including the Government, does not mitigate, replace or eliminate the duty of an IBT officer to serve the membership's interests by investigating" charges of wrongdoing by a fellow officer). Once he admittedly became aware of DOL's probe, Mr. Ross' failure to conduct an independent inquiry into Mr. Agathos' union activities was inexcusable. His acknowledged failure to investigate, then, compels a finding that he breached his fiduciary duty to the general membership.

■ Accepting *arguendo* Mr. Ross' contention that an IBT officer need not investigate allegations of wrongdoing in the event of a Government inquiry that focuses on those allegations, Mr. Ross still delinquently failed to discharge his fiduciary obligations.

---

2. The LMRDA prohibits union employment of those convicted of assault "which inflicts griev-ous bodily injury." 29 U.S.C. § 504.

While Mr. Ross knew of the DOL probe, he did not know, and did not attempt to learn, the scope of that probe. For all Mr. Ross knew, DOL could have been investigating several different types of wrongdoing on the part of Mr. Agathos. In fact, only at the conclusion of the Government's inquiry did Mr. Ross learn that the investigation encompassed Mr. Agathos' relationship with HREU Local 69. It is disingenuous, then, for Mr. Ross to ascribe his lack of action in this area to the existence of governmental activity. Awareness of a fellow union member's alleged wrongdoing, coupled with ignorance of the scope of the Government's investigation into that supposed wrongdoing, demands action. Mr. Ross, the President of the Local, remained idle. In so doing, he breached his fiduciary obligation to the rank and file of Local 97.[3]

### 2. Local 97's Payment of Mr. Ross' and Mr. Agathos' Legal Fees

#### a. Article IX, Section 9(c): General Membership Approval

■ The Independent Administrator found that Mr. Ross violated the IBT Constitution and Local 97's Bylaws when he caused Local 97 to pay his and Mr. Agathos' legal fees incurred in connection with the DOL probe. More specifically, the Independent Administrator concluded that Mr. Ross violated Article IX, Section 9(c) of the IBT Constitution, which permits a Local to pay a trustee's or officer's legal fees if such expenditures are approved by a majority of the Executive Board and a majority of the general membership voting at a general membership meeting. The Independent Administrator noted that "[t]he only reasonable interpretation of Article IX, Section 9(c) of the IBT Constitution is that the membership give its prior approval of any expenditure of legal expenses." (Ind.Admin.Dec. at 16 n. 9). It is well settled that the Independent Administrator has authority to issue binding interpretations "of the IBT Constitution insofar as the exercise of that power relates ... to disciplining corrupt or dishonest IBT or IBT-affiliated officers, agents, employees or members." *United States v. IBT*, 905 F.2d 610, 619 (2d Cir.1990). As the Independent Administrator found, Section 9(c) clearly contemplates that the general membership approve payment of legal expenses prior to actual payment; after-the-fact ratification, such as occurred here, is not sufficient. It is undisputed, however, that Mr. Ross failed to obtain prior approval for the payment of his and Mr. Agathos' legal fees from a majority of the general membership. *Respondent's Memorandum*, at 20–21. Accordingly, when he caused Local 97 to make such unapproved expenditures, he violated Article IX, Section 9(c) of the IBT Constitution.

Mr. Ross' arguments to the contrary are not persuasive. He notes that neither he nor Mr. Agathos admitted any wrongdoing or were the subject of criminal charges. While the absence of criminal charges is a prerequisite to payment of legal fees under Section 9(c), approval from a majority of the general membership is also required. *See* Art. IX, § 9(c). Mr. Ross also avers that Local 97's counsel informed Mr. Ross that the Local could pay Mr. Agathos' legal fees absent the filing of an indictment and if payment was in accordance with the IBT Constitution and Local Bylaws. *Respondent's Memorandum*, at 19–20. As previously demonstrated, Mr. Ross ignored counsel's advice because pay-

3. Mr. Ross also asserts that because the Government failed to indict Mr. Agathos, "it can be safely assumed that Agathos' conduct was not criminal or fraudulent." *Respondent's Memorandum*, at 16–17. This Court has held that "conduct that is not itself criminal can constitute a violation of the IBT Constitution." February 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1182–83 (S.D.N.Y.1993). Therefore, while the absence of an indictment could indicate that Mr. Agathos' conduct was not criminal, it does not suggest that his conduct comported with Local 97's Bylaws and the IBT Constitution. Although these latter provisions often hold IBT members to a higher standard of conduct than is imposed by United States criminal statutes, *see id.*, the greater protection afforded by Union rules benefits the general membership. *See* IBT Const., Preamble ("This Constitution recognizes and protects the autonomy, integrity and identity of ... the members."). Mr. Ross, who is sworn to serve the membership's interests, should promote the higher standard imposed by the Union rules. His attempt to obtain refuge in the absence of an indictment against Mr. Agathos, as well as his conduct in this matter, suggest that the welfare of the rank and file is not his primary concern.

ment of his and Mr. Agathos' legal fees did not occur in a constitutionally appropriate fashion.

■ Finally, Mr. Ross asserts that Local 97 received approval from then-General President James R. Hoffa to hold annual rather than quarterly meetings. *Respondent's Memorandum*, at 5 & n. 3. Supposedly due to the rarity of general membership meetings, Local 97 developed a practice of having the general membership ratify expenditures that had occurred during the year, which allegedly was implicit in permission to hold meetings only once a year. *See id.* at 21. "Otherwise, the Local would bring 'reproach' upon itself by failing to pay creditors in a timely fashion." *Id.* This argument is flawed and duplicitous. It is flawed because a Local Bylaw may not conflict with the IBT Constitution: The IBT Constitution provides that Local Union Bylaws "must comply, and may not conflict, with the provisions of the International Constitution." IBT Const, Art. XXII, § 1. In interpreting permission to hold annual meetings as a waiver of the rule requiring prior approval from the general membership of the payment of legal fees, Local 97's Executive Board has adopted a policy directly in conflict with the IBT Constitution. Accordingly, the Independent Administrator correctly concluded that "[t]he Local's custom of seeking approval of its bills after they are paid does not excuse Ross' violation of a specific provision of the IBT Constitution which requires prior approval." (Ind.Admin.Dec. at 17).

■ Respondent's argument is also duplicitous. Mr. Ross' counsel ominously predicts that Local 97 will default on its financial obligations if, on the one hand, it continues to hold annual meetings but, on the other, is not permitted to ignore all rules requiring general membership approval prior to making certain expenditures. Respondent conveniently omits to mention that not all expenditures require approval of the general membership. Local 97's Bylaws provide that "[t]he Executive Board is hereby empowered to ... [t]ransact all business and manage and direct the affairs of the Local Union between membership meetings except as may otherwise be herein provided." Local 97 Bylaws, § 13(A)(g). In other words, Local 97 can operate in the ordinary course of business without the approval of the general membership, and indeed is permitted to operate autonomously in virtually all financial matters. *See id.* at § 13(A) (Local 97's Executive Board can, without prior approval from the general membership, make loans, hire support staff, lease, purchase or sell real estate, and create deeds, mortgages and trusts). Section 13 of Local 97's Bylaws permits the Executive Board to operate in almost all spheres without general membership approval. Therefore, permission to hold annual general membership meetings does not imply that Local 97 is exempt from all IBT constitutional provisions that require general membership approval prior to making certain expenditures. By raising the specter of default as a justification for this "exemption," however—wholly ignoring Section 13 of Local 97's Bylaws—Mr. Ross' counsel has transgressed the reasonable limits of creative advocacy.[4]

### b. Section 13(A)(e) of Local 97's Bylaws

■ The Independent Administrator found that by causing Local 97 to pay his and Mr. Agathos' legal fees, Mr. Ross violated Section 13(A)(e) of Local 97's Bylaws. Section 13(A)(e) provides that Local 97 can pay the legal fees of its officers and members if, in the judgment of the Executive Board, such payment is "necessary or desirable to protect, preserve, or advance the interests of the organization." Local 97 Bylaws, § 13(A)(e).

4. As to payment of Mr. Ross' legal fees, the Independent Administrator found that even at the general membership meeting, Mr. Ross did not disclose that he had refused to testify before the Grand Jury. Mr. Ross explained that "I wasn't proud about that, I didn't have to have the whole world know about it." (Ind.Admin.Dec. at 18). Mr. Ross is entitled not to "have the whole world" know about his decision not to testify. He is not, however, entitled to legal fees absent such disclosure. By not disclosing his refusal to testify to the general membership, he invalidated the membership's ratification of the Local's payment of his legal fees. As previously noted, even a valid ratification by the general membership would not exculpate Mr. Ross, because payment of legal fees under the IBT Constitution is permissible only upon prior approval of the general membership.

As a preliminary matter, this Court notes that to the extent this Bylaw permits payment of legal fees without prior approval of the general membership, the Bylaw conflicts with Article IX, Section 9(c) of the IBT Constitution, and is thus invalid. In addition, the Independent Administrator found that payment of Mr. Ross' legal fees did not "advance the interests of the organization." The Independent Administrator reasoned that "[b]y invoking his Fifth Amendment privilege before the Grand Jury, Ross was protecting his personal interest; he was not furthering the interests of the Local. The interests of the Local demanded full and complete cooperation by Ross with the DOL investigation." (Ind.Admin.Dec. at 19).

The Independent Administrator reasonably found that in refusing to testify before the Grand Jury, Mr. Ross did not advance the interests of the Local. Mr. Ross admits that his motive in refusing to testify was personal: He invoked his privilege against self-incrimination on the advice of counsel after learning that he was a target of the DOL investigation. *Respondent's Memorandum*, at 22. In refusing to testify, then, Mr. Ross advanced his own interests, not those of the general membership. Indeed, Mr. Ross tacitly acknowledged that refusing to testify did not serve the general membership. In admitting that he failed to disclose his refusal to testify to the general membership, he claimed that "I wasn't proud about that, I didn't have to have the whole world know about it." (Ind.Admin.Dec. at 18). Moreover, the DOL probe focused on wrongdoing involving Local 97. As this Court repeatedly has held, the general membership has an immense stake in eradicating wrongdoing among its officers and trustees. *See* July 13, 1992 Opinion & Order, 803 F.Supp. 740, 746 (S.D.N.Y.1992); May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1353 (S.D.N.Y.), *aff'd*, 981 F.2d 1362 (2d Cir.1992). By refusing to testify, Mr. Ross certainly did not advance the DOL investigation, and thus, he failed to advance the interests of Local 97 and its members. Local 97's payment of his legal fees was thus improper under Section 13(A)(e).

■ Furthermore, it is worth noting that the Independent Administrator has not "punished" Mr. Ross for invoking his Fifth Amendment privilege or for relying on the advice of counsel. *Respondent's Memorandum*, at 22. Mr. Ross is not entitled to have the Local pay all legal fees incurred in connection with his union activities. "A union official may obtain reimbursement of his legal expenses only when his actions inure to the benefit of the union." *United States v. IBT*, 970 F.2d 1132, 1138 (2d Cir.1992). The Independent Administrator found that while Mr. Ross certainly was entitled to invoke his Fifth Amendment privilege, he was not entitled to payment of his legal fees when, as here, invoking that privilege did not advance the Local's interests.

■ Similarly, the Independent Administrator found that Mr. Ross violated Section 13(A)(e) by causing Local 97 to pay Mr. Agathos' legal fees. The Independent Administrator found that payment of Mr. Agathos' legal fees did not advance the Local's interests because "Ross failed to conduct any inquiry into the DOL investigation and thus was in no position to judge the merits of the DOL's case." (Ind.Admin.Dec. at 24). This finding is neither arbitrary nor capricious. Although the DOL investigation did not produce criminal charges against Mr. Agathos, it is clear "that conduct that is not itself criminal can constitute a violation of the IBT Constitution." February 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1182–83 (S.D.N.Y. 1993). Moreover, Mr. Agathos paid HREU Local 69 $3,500 to resolve a claim that Mr. Agathos was improperly reimbursed for personal expenses. At the very least, such knowledge should have put Mr. Ross on notice that he had to investigate Mr. Agathos' union activities. Such an investigation, if taken, might have revealed that Mr. Agathos' conduct was detrimental to the general membership of Local 97. Therefore, payment of Mr. Agathos' legal fees absent such an investigation clearly did not advance the interests of Local 97.

By arguing that Local 97 should have paid his and Mr. Agathos' legal fees, Mr. Ross' counsel seeks to convert the payment of an officer's or member's legal fees from a privi-

lege, occurring when payment advances the union's interests, into an entitlement, earned by the Olympian achievement of avoiding criminal charges. Counsel does not even opine how payment of Mr. Ross' and Mr. Agathos' legal fees in this scenario advances Local 97's interests. Although Mr. Ross and his counsel ignore what to them must seem an inconvenient restriction, Section 13(A)(e) plainly permits payment of an officer's legal fees only upon a showing that such payment serves the Local's interests. The Independent Administrator correctly concluded that payment of Mr. Ross' and Mr. Agathos' fees was not in the Local's interests. Accordingly, in causing Local 97 to make such payments, Mr. Ross violated Section 13(A)(e).

### c. Article XIX, Section 7(b)(3): Embezzlement of Union Funds

■ Article XIX, Section 7(b)(3) of the IBT Constitution makes embezzlement a ground for union discipline. The Independent Administrator found that in causing Local 97 to pay his and Mr. Agathos' legal fees, Mr. Ross acted with fraudulent intent to deprive Local 97 of its funds. (Ind.Admin.Dec. at 20); *see* February 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1178–79 (S.D.N.Y.1993) (applying fraudulent intent standard in connection with charge of embezzling union funds); November 8, 1991 Memorandum & Order, *slip op.* at 5–6, 1991 WL 243268 (S.D.N.Y.1991) ("Nunes") (same), *aff'd,* 962 F.2d 4 (2d Cir.1992); November 8, 1991 Memorandum & Order, *slip op.* at 11, 1991 WL 243292 (S.D.N.Y.1991) ("Local 295") (same); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1126 (S.D.N.Y. 1991) (same), *aff'd,* 978 F.2d 706 (2d Cir. 1992). The Independent Administrator inferred fraudulent intent from Mr. Ross' failure to seek and obtain general membership approval for payment of legal fees, his failure to disclose to the general membership his refusal to testify before the Grand Jury, and his violation of Local 97's Bylaws. Given such conduct, the Independent Administrator could reasonably find that Mr. Ross intended to defraud Local 97.

Mr. Ross, as President of Local 97, cannot be considered an abecedarian; he had to have fairly detailed knowledge of the IBT Constitution and Local 97's Bylaws, both of which he violated in the course of having Local 97 pay his and Mr. Agathos' legal fees. *See United States v. IBT,* 978 F.2d 68, 73 (2d Cir.1992) ("Because [respondents] were self-described 'reformers' fully aware of past abuses within the IBT, the administrator correctly discounted appellants' excuses that they were new to their jobs and relied on past local practices."). Not only did Mr. Ross knowingly violate the IBT Constitution and Local 97's bylaws, he also intentionally deceived the general membership. Mr. Ross acknowledged that his decision not to inform the general membership of his refusal to testify before the Grand Jury stemmed not from personal ignorance or oversight, but rather from a desire to keep his conduct from the general membership. Taken together, Mr. Ross' actions in connection with Local 97's payment of legal fees reveals a callous disregard of, and lack of respect for, the general membership he purports to represent. Indeed, respondent's conduct belies the emptiness of his assertion that he "has always had the best interests of Local's [sic] membership at heart." *Respondent's Memorandum,* at 23. The Independent Administrator's finding of fraudulent intent is amply supported by the evidence, and is not arbitrary or capricious.

### B. The Penalty Imposed By the Independent Administrator Is Not Arbitrary or Capricious

■ On each of the charges brought by the Investigations Officer, the Independent Administrator permanently barred Mr. Ross from holding IBT office, ordered his removal as President of Local 97, and prohibited him from receiving compensation from any IBT-affiliated entity. Furthermore, the Independent Administrator precluded IBT-affiliated entities from making contributions on respondent's behalf to employment benefit plans, whether controlled by IBT-affiliates or third-parties, although the Independent Administrator did not alienate his vested benefits. Finally, the Independent Administrator prohibited any IBT-affiliated entity from paying Mr. Ross' legal fees in connection with this action. In imposing these penal-

ties, the Independent Administrator concluded that

> Ross completely abdicated his fiduciary duty as the principal officer of Local 97 by failing to look into the beating incident, by failing to inquire into the nature and scope of the DOL investigation, and by violating the IBT Constitution and Local 97 Bylaws in connection with the payment of Agathos' and his legal expenses. Ross has proven that he is not fit to serve in any position of trust or responsibility within the IBT or any of its affiliates.

(Ind.Admin.Dec. at 27).

Mr. Ross claims that the penalty imposed upon him by the Independent Administrator is arbitrary and capricious because other IBT members found to have committed similar, or more serious, offenses received more lenient punishments. This Court finds that the Independent Administrator had ample justification for the penalty he imposed on each count. As to Count One, other IBT officers who breached their fiduciary duties by failing to investigate allegations of wrongdoing have received similar, or more severe, penalties than those imposed upon Mr. Ross. *See, e.g.,* February 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1181 (S.D.N.Y.1993) (Union officer who breached fiduciary duty to membership permanently barred from IBT); July 13, 1992 Opinion & Order, 803 F.Supp. 740, 742 (S.D.N.Y.1992) (Union officers permanently barred from IBT for failing to investigate that fellow officers were members of LCN); May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1357 (S.D.N.Y.) (President of IBT Local 682 prohibited from holding Union office or any employment with IBT due to his failure to investigate allegations that his Vice President was a member of La Cosa Nostra). Similarly, as to Count Two, IBT officials who engaged in improper financial dealings in connection with the IBT have received significant penalties. *See, e.g.,* February 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1184 (S.D.N.Y.1993) (Union officer who engaged in improper financial transactions permanently barred from IBT); February 11, 1992 Memorandum & Order, 787 F.Supp. 345, 349 (S.D.N.Y.) (five-year suspensions for IBT officers who embezzled union funds), *aff'd,* 978 F.2d 68 (2d Cir.1992); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1124 (S.D.N.Y.1991) (same), *aff'd,* 978 F.2d 706 (2d Cir.1992).

█ Moreover, the Independent Administrator has authority to impose a sentence that is more severe than that imposed on other IBT members who committed similar conduct. *See United States v. IBT,* 981 F.2d 1362, (2d Cir.1992) (given sound reasoning for the punishment, court upheld Independent Administrator's authority to impose harsher sanction than that imposed on other IBT members who engaged in similar misconduct). As the Second Circuit noted when it reversed the district court's imposition of more severe sanctions than those set by the Independent Administrator, "[a] court may only consider whether the [Independent] Administrator made 'an allowable judgment in [his or her] choice of remedy.'" *United States v. IBT,* 978 F.2d 68, 73–74 (2d Cir. 1992) (quoting *Sokoloff v. Saxbe,* 501 F.2d 571, 576 (2d Cir.1974)). The circuit court added that "[t]he experienced Independent Administrator—himself a former federal district court judge—heard the witnesses and fixed a penalty. On this record there is no basis for finding the penalty chosen by the administrator was either arbitrary or capricious." *Id.* at 74. Given the Independent Administrator's broad authority and discretion in imposing sanctions on disciplined IBT members, the penalty imposed on Charges One and Two cannot be considered arbitrary or capricious.

### III. CONCLUSION

For the reasons stated above, Mr. Ross' objections to the Independent Administrator's decision are DENIED. The decision of the Independent Administrator is AFFIRMED IN ITS ENTIRETY. In addition, the stay of penalties imposed by the Independent Administrator is DISSOLVED, effective immediately.

SO ORDERED.