UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

In re APPLICATION LXXIII of the INDEPENDENT ADMINISTRATOR.

No. 88 CIV. 4486 (DNE).

United States District Court, S.D. New York.

July 13, 1992.

Charles M. Carberry, Investigations Officer of the Intern. Broth. of Teamsters, New York City (Celia A. Zahner, of counsel), for defendants.

Otto G. Obermaier, U.S. Atty. S.D.N.Y. (Steven C. Bennett, Asst. U.S. Atty., of counsel) for U.S.

Iannuzzi and Iannuzzi, New York City (John N. Iannuzzi, of counsel) for Patrick Crapanzano and Louis Lanza.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by the plaintiff United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The Consent Decree provides for three Court-appointed officials: the Independent Administrator to oversee the Consent Decree's remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime

through the election and disciplinary provisions.

Application LXXIII presents for this Court's review the decision of the Independent Administrator regarding disciplinary charges brought by the Investigations Officer against Patrick Crapanzano ("Patrick" or "Crapanzano"), the President of IBT Local Union 27,[1] which is located in New York City, and Louis Lanza ("Lanza"), the Vice President of Local 27.[2] The Independent Administrator found that Crapanzano and Lanza (the "respondents") brought reproach upon the IBT by disregarding their fiduciary duty to investigate and act with respect to allegations and evidence that Pasquale "Patsy" Crapanzano ("Patsy") and Liborio "Robert" Crapanzano ("Robert"), former members of the Executive Board of Local 27, were members of La Cosa Nostra.[3] For this violation of the IBT Constitution, the Independent Administrator permanently barred Crapanzano and Lanza from the IBT. The Independent Administrator also prohibited IBT-affiliated entities from making contributions on respondent's behalf to employment benefit plans, though the Independent Administrator did not alienate their vested benefits. Finally, the Independent Administrator prohibited any IBT-affiliated entity from paying Crapanzano's and Lanza's attorneys fees, and he stayed imposition of his penalty pending this Court's decision.

Respondents argue that the decision of the Independent Administrator is not supported by substantial evidence and, as a result, is arbitrary and capricious. This Court finds that respondents' arguments are without merit and that the decision of the Independent Administrator is fully supported by the evidence. Accordingly, for the reasons stated below, the decision of the Independent Administrator is affirmed.

1. Before serving as President, Crapanzano had been Vice President of Local 27, and a member of its Executive Board, for approximately thirteen years.

2. Before serving as Vice President of Local 27, Lanza had been a Trustee for over ten years, and then Recording Secretary for approximately nine years. Lanza has been a member of the Local 27 Executive Board for over twenty years.

## I. BACKGROUND

The Investigations Officer charged that respondents brought reproach upon the IBT in violation of Article II, Section 2(a) and Article XIX, Sections 6(b)(1) and (2) of the IBT Constitution by failing to investigate whether Patsy and Robert, former Local 27 officers, were members of La Cosa Nostra ("LCN"). Article II, Section 2(a) is the IBT membership oath, which provides in relevant part that every IBT member shall "conduct himself or herself in a manner so as not to bring reproach upon the Union." Article XIX, Section 6(b) is a non-exhaustive list of disciplinary charges that may be filed against IBT members. Two such charges are: (1) violating the IBT Constitution, a Local Union bylaw or other Union rule; and (2) violating the IBT membership oath. *See* Article XIX, §§ 6(b)(1)–(2).

■ Pursuant to paragraph F.12(C) of the Consent Decree, the Independent Administrator must decide disciplinary hearings using a "just cause" standard. The Investigations Officer has the burden of establishing just cause by a preponderance of the evidence. December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y. 1990). After conducting a hearing (the "hearing"), where respondents were represented by counsel, and receiving post-hearing briefs, the Independent Administrator issued a 22–page decision. The Independent Administrator found that the Investigations Officer satisfied his burden of proving that respondents breached their fiduciary duty by failing to investigate or otherwise act in connection with allegations of Patsy's and Robert's membership in organized crime. (Decision of the Independent Administrator ("Ind.Admin.Dec.") at p. 18).

3. Patrick is Patsy's son and Robert's brother. Patsy was Secretary–Treasurer and Robert was President of Local 27. On June 28, 1990, the Investigations Officer charged Patsy and Robert with membership in La Cosa Nostra. To resolve these charges, Patsy and Robert agreed, on October 7, 1990 and November 20, 1991 respectively, to resign permanently from the IBT.

### A. Allegations of Patsy's and Robert's Ties to LCN

Specifically, the Independent Administrator found that beginning in 1984 and continuing through 1991, the respondents received a great deal of information surrounding Patsy's and Robert's affiliation with organized crime. In fact, respondents admitted in the hearing that they were aware of the numerous allegations about Patsy's and Robert's ties to organized crime.

The Independent Administrator found that Patrick learned of the allegations surrounding his father and brother in 1984 or 1985, after reading an article in the Miami Herald that reported on his family's connections to organized crime. Patrick also knew of a 1989 article that reported on his father's and brother's LCN connections. Aside from media coverage of Patsy's and Robert's LCN ties, Patrick had other information indicating that his fellow IBT officers were members of organized crime. Patrick knew of the Investigations Officer's inquiry into Patsy's and Robert's mafia links, and he knew that Robert resigned from the IBT rather than confront the Investigations Officer's charge that he was a member of the Gambino crime family.

The Independent Administrator found that Lanza learned of the allegations in 1983 or 1984, and that Patrick had alerted him to the Miami Herald article that discussed Patsy's and Robert's ties to LCN. Lanza also read about Robert's crime ties in another daily periodical, the Staten Island Advance, in 1983 or 1984, and in an August 1989 edition of New York Newsday. In addition, Lanza read the Investigations Officer's charges against Robert and Patsy in the October 1990 issue of The International Teamster magazine.

### B. Responses to the Allegations

The Independent Administrator found that respondents were aware of allegations concerning ties between LCN and Local 27, and that they breached their fiduciary duty by failing to take appropriate action. In fact, during sworn in-person testimony before the Investigations Officer, Lanza at-tested to his awareness of the allegations of Patsy's and Robert's ties to LCN. He stated, however, that he did not discuss the allegations with the Executive Board or with the rank and file, nor did he take any other action with respect to these allegations. He also attested to his belief that he had no obligation to undertake any type of inquiry into the allegations:

IO: You said you read articles in S.I. Advance.... Didn't they mention the Crapanzanos?

Lanza: He just showed me an article about my uncle and I don't believe that article. I am not saying—what I am saying is there would be no reason for me to ask anything about a newspapers clipping being reputed in the so-called— in the newspapers. I have to take what I know as factual in my mind and apply it.

IO: After seeing any articles, did you ever ask the Crapanzanos if any of that was factual?

Lanza: No.

IO: Did you ever ask the Board to make any inquiry as to whether any of that material that came to your attention was factual?

Lanza: No. Again, I repeat, I don't see no reason for that.

(Ind.Admin.Dec. at p. 9).

At the hearing before the Independent Administrator, Lanza contradicted his deposition testimony and detailed what he claimed was his investigation into the allegations. Lanza stated that he checked the Local's financial reports, minutes and cash disbursement books, and that he spoke with various individuals connected to Local 27's pension fund, including Bernie Block and Harvey Goldstein, the Fund's accountant and attorney. Lanza also stated that he asked Patrick about the allegations, and Patrick replied that he had asked Patsy and Robert a question on this subject, and that they denied membership in LCN.

The Independent Administrator rejected Lanza's testimony at the hearing. The Independent Administrator noted that in his statements to the Investigations Officer, before the filing of charges, Lanza unequivocally averred that he did not initiate

an inquiry into the allegations, nor did he discuss the matter with other officers or the general membership. At the hearing, however, after the filing of charges, Lanza provided details of an investigation he supposedly conducted into the veracity of the allegations. The Independent Administrator found that Lanza's post-charge testimony at the hearing was not credible in light of Lanza's pre-charge testimony before the Investigations Officer.

The Independent Administrator added that even if he did credit Lanza's testimony at the hearing, he would find Lanza's "investigative efforts wholly lacking.... [A] cursory review of the Local's books is [not] an effective way to investigate the possibility of organized crime influence in one's Local. Moreover, asking Patrick about his brother's and father's organized crime ties falls far short of an adequate investigation." (Ind.Admin.Dec. at p. 11). The Independent Administrator concluded that Lanza's purported investigation was "simply not designed to discern the truth of the allegations." (Ind.Admin.Dec. at p. 11).

Patrick also has given contradictory testimony in this matter. During his sworn in-person testimony before the Investigations Officer, Patrick stated that he took no action concerning his relatives' organized crime ties even though he was aware of allegations linking them to LCN. At the hearing, however, Patrick claimed to have conducted an investigation into the allegations. Patrick asserted that he asked his father and brother if they were involved with the mafia, and he also claims to have spoken with Lanza, Harvey Goldstein, John Iannuzzi, his attorney in this matter, and Irving Stern and Mike Piccuero, two Local 27 accountants. The Independent Administrator refused to credit Patrick's testimony at the hearing in light of his testimony before the Investigations Officer, which he gave before the filing of charges in this matter. Moreover, the Independent Administrator noted that nothing in the record indicated that he spoke either to Stern or Piccuero about the allegations. The Independent Administrator added that even if he credited Patrick's testimony at the hearing, Patrick's purported efforts to investigate this matter fell far short of an adequate inquiry into the allegations.

Finally, the Independent Administrator found that Patrick and Lanza rewarded Robert with two bonuses in 1991 totalling $36,777. At the time of the first bonus, given on July 15, 1991, Robert had already been charged by the Investigations Officer with involvement in La Cosa Nostra. At the time of the second bonus, given on December 4, 1991, Robert had already resigned from the IBT rather than confront the Investigations Officer's charges.

### C. Independent Administrator's Findings

The Independent Administrator found that the Investigations Officer had shown just cause for the charges ·that the respondents breached their fiduciary duties to the general membership of Local 27 by deliberately failing to act upon the serious and persistent allegations that Patsy and Robert were members of LCN. After concluding that the respondents knew of the allegations about Patsy's and Robert's ties to LCN, and that the respondents had an affirmative duty to investigate these allegations, the Independent Administrator found that the respondents' failure to initiate a thorough investigation constituted a breach of their fiduciary duty. (Ind.Admin.Dec. at pp. 13–14).

The Independent Administrator also rejected respondents' arguments, in which they attempted to justify their conduct in this matter. Respondents first asserted that they had no duty to investigate the allegations that Patsy and Robert had ties to organized crime. They claimed that Section 501(a) of the Labor Management Reporting Disclosure Act ("LMRDA"), 29 U.S.C. § 501(a), imposes a fiduciary duty upon union officers only with regard to the use of union money or property. In rejecting this contention, the Independent Administrator reasoned that Section 15(b) of Local 27's By-laws imposes on the Local's officers a duty to investigate any alleged breach of fiduciary duty by a fellow officer. In addition, the Independent Administrator noted that the decisions of this Court

have held that an IBT officer's fiduciary duty includes the obligation to investigate and take action with respect to allegations of corruption in the IBT. (Ind.Admin.Dec. at pp. 14–17).

Respondents also averred that they lacked the resources to initiate an investigation, instead placing this responsibility on the Government. The Independent Administrator first noted that respondents admitted to having disciplinary authority over Union officials. The Independent Administrator added that the respondents could have employed any number of investigative techniques had they desired to discharge this disciplinary authority and satisfy their fiduciary duty. For instance, respondents could have sought assistance from the Government or arranged for a trained professional to conduct in-depth interviews of Patsy and Robert. (Ind.Admin.Dec. at pp. 17–18).

## II. DISCUSSION

The respondents argue that the decision of the Independent Administrator is not supported by substantial evidence and, as a result, is arbitrary and capricious. Essentially, respondents contend that they had no duty to conduct an investigation into the allegations, and that if they did have such a duty, their conduct in this matter constituted an adequate investigation.

█ In reviewing decisions of the Independent Administrator, it is well settled that the findings of the Independent Administrator "are entitled to great deference." *United States v. IBT*, 905 F.2d 610, 616 (2d Cir.1990), *aff'g* March 13, 1990 Opinion & Order, 743 F.Supp. 155 (S.D.N.Y. 1990). This Court will overturn the findings of the Independent Administrator when it determines that they are, on the basis of all the evidence, "arbitrary or capricious." *United States v. IBT*, 964 F.2d 1308, 1311 (2d Cir.1992); August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); March 13, 1990

Opinion & Order, 743 F.Supp. 155, 165 (S.D.N.Y.1990), *aff'd*, 905 F.2d 610 (2d Cir. 1990); *see* July 9, 1992 Opinion & Order, 803 F.Supp. 734, 737–738 (S.D.N.Y.1992); May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1352 (S.D.N.Y.1992); April 27, 1992 Memorandum & Order, 791 F.Supp. 421, 425 (S.D.N.Y.1992); February 11, 1992 Memorandum & Order, 787 F.Supp. 345, 350 (S.D.N.Y.1992); January 20, 1992 Memorandum & Order, 782 F.Supp. 256, 259 (S.D.N.Y.1992); January 16, 1992 Memorandum & Order, 782 F.Supp. 238, 241 (S.D.N.Y.1992); November 8, 1991 Memorandum & Order, *slip opinion*, at 4–5, 1991 WL 243268 (S.D.N.Y.1991); October 29, 1991 Opinion & Order, 776 F.Supp. 144, 152–53 (S.D.N.Y.1991), *aff'd*, 954 F.2d 801 (2d Cir.1992), *cert. denied*, — U.S. —; 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); October 25, 1991, Order, *slip opinion*, at 4–5 (S.D.N.Y.1991); October 24, 1991 Memorandum & Order, 777 F.Supp. 1133, 1136 (S.D.N.Y.1991); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1132 (S.D.N.Y.1991), *aff'd*, 964 F.2d 1308 (2d Cir. 1992); October 11, 1991 Memorandum & Order, 777 F.Supp. 1127, 1128 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1125 (S.D.N.Y.1991); August 14, 1991 Memorandum & Order, *slip opinion*, at 4, 1991 WL 161084 (S.D.N.Y.1991); July 31, 1991 Memorandum & Order, *slip opinion*, at 3–4, 1991 WL 1502269113887099999999 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (Table) unpublished slip op. (2d Cir.1992); July 16, 1991 Opinion & Order, *slip opinion*, at 3–4, 1991 WL 136029 (S.D.N.Y.1991); June 6, 1991 Opinion & Order, 775 F.Supp. 90, 93 (S.D.N.Y. 1991), *aff'd in relevant part*, 948 F.2d 1278 (2d Cir.1991); May 13, 1991 Memorandum & Order, 764 F.Supp. 817, 820–21 (S.D.N.Y. 1991); May 9, 1991 Memorandum & Order, 764 F.Supp. 797, 800 (S.D.N.Y.1991) *aff'd*, 956 F.2d 1161 (2d Cir.1992); May 6, 1991 Opinion & Order, 764 F.Supp. 787, 789 (S.D.N.Y.), *aff'd*, 940 F.2d 648 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); December 27, 1990 Opinion & Order, 754 F.Supp.

333, 337 (S.D.N.Y.1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191–92 (S.D.N.Y.1990); January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1045–57, *aff'd*, 907 F.2d 277 (2d Cir.1990).

### A. Duty to Investigate the Allegations

■ The respondents contend that they had no duty to investigate the allegations concerning links between LCN and Local 27 officers. Such an argument is baseless. It is now well settled that all IBT members are bound by the disciplinary provisions of the Consent Decree. *See United States v. IBT*, 905 F.2d 610, 621 (2d Cir.1990); May 6, 1991 Opinion & Order, 764 F.Supp. 787, 789–90 (S.D.N.Y.1991), *aff'd*, 940 F.2d 648 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991). The disciplinary power vested in the Independent Administrator by the Consent Decree "plainly include[s] the power to interpret the disciplinary provisions of the IBT Constitution." *United States v. IBT*, 905 F.2d at 619. Moreover, the Independent Administrator's "comprehensive right to review disciplinary charges ... necessarily includes the final authority to determine what constitutes an offense subject to discipline under the IBT Constitution." *Id.* The Independent Administrator and this Court have determined that failing to investigate allegations that a fellow IBT member has ties to organized crime is a breach of fiduciary duty that brings reproach upon the Union, in violation of the IBT Constitution. *See, e.g.,* May 15, 1992 Opinion & Order, 792 F.Supp. 1346 (S.D.N.Y.1992). Accordingly, respondents are subject to discipline, under the provisions of the Consent Decree and the IBT Constitution, for failing to investigate allegations of corruption in Local 27.

Most recently, this Court issued an opinion, dated May 15, 1992, in which it set forth a detailed justification for holding a Union officer to this obligation. *See id.* at 1352–53. After tracing the damaging effects of LCN influence in the IBT, this Court stated that

Quite simply, mafia influence in the IBT is wholly inconsistent with the interests of the rank and file. Accordingly, every IBT officer must, with unstinting effort and steely resolve, wage an active campaign to purge the Union of the hideous influence of organized crime. While appropriate responses will vary given the unique facts of different situations, a Union officer must in all cases take affirmative steps to eradicate LCN influence. LCN influence is most insidious, and its stranglehold on the IBT greatest, when a member of organized crime holds high Union office. Such a situation provides organized crime with direct and unrestricted access to a position of power within the IBT. Half-hearted responses to any information suggesting mafia influence in the IBT constitute a breach of fiduciary duty. An impotent reaction to allegations that a mob leader holds Union office is nothing less than a gross abdication of responsibility and a blatant betrayal of the membership's trust.

May 15, 1992 Opinion & Order, *slip opinion* at p. 1353 (citations omitted).

### B. Adequacy of the Purported Investigation

The respondents also contend that they conducted an adequate and reasonable investigation into this matter. This argument is without merit. This Court has held that "[u]pon receiving information that a fellow officer or IBT member has ties to organized crime, an IBT officer will discharge his or her fiduciary duty only by employing whatever means are necessary to verify or refute the information and then implementing appropriate remedial measures." May 15, 1992 Opinion & Order, *slip opinion* at p. 1354. The respondents' conduct in this matter does not remotely resemble even a cursory investigation into the allegations.

#### 1. Respondents' Conduct in this Matter

■ The Independent Administrator found that respondents did nothing at all in response to the allegations. (Ind.Admin.Dec. at p. 18). In so holding, he did

not credit respondents' testimony at the hearing, where they suddenly "remembered" having conducted an inquiry into the allegations. This Court agrees with the Independent Administrator's finding. The respondents first testified to having conducted an investigation only after the filing of charges by the Investigations Officer. This testimony was inconsistent with their testimony before the Investigations Officer, where they admittedly failed to conduct any investigation in connection with this matter. Such a change in testimony suggests a desperate effort to avoid punishment rather than a truthful recitation of past events. Clearly, by failing to act at all in the face of repeated allegations of Patsy's and Robert's criminal involvement, respondents breached their fiduciary duty.

■ Moreover, even if this Court credited respondents' testimony at the hearing, their purported investigation falls pathetically short of a meaningful inquiry into this matter. Respondents contended at the hearing that: (1) they each spoke with accountants and lawyers associated with Local 27 about this matter; (2) Patrick asked his father and brother about the veracity of the allegations; (3) Lanza checked the financial records of Local 27 for financial impropriety; and (4) Lanza asked Patrick about the allegations, and Patrick told him that Patsy and Robert had denied the allegations.

These responses, if they ever occurred, do not constitute an adequate investigation into the allegations. In fact, they assured that respondents would never have to learn the truth or falsity of the allegations. Patrick's "questioning" of Patsy and Robert consisted of accepting at face value their denial of the allegations. Similarly, Lanza tacitly accepted this denial by remaining content with Patrick's "questioning." Lanza's supposed perusal of Local 27's financial records would in no way bring him closer to ascertaining the veracity of the allegations. While the respondents supposedly spoke with accountants and lawyers connected with Local 27, the Independent Administrator found that at least some of

these discussions may not have involved the allegations. Even if other conversations did deal with this issue, respondents provide no information suggesting that having a chat with Local 27's outside professionals was an adequate or effective way to investigate the allegations.

In sum, both this Court and the Independent Administrator have found that respondents took no action at all in response to persistent allegations of corruption in Local 27. This Court finds that the Independent Administrator correctly refused to credit the respondents' inconsistent, post-charge testimony at the hearing, in which they purported to investigate this matter. Moreover, even their alleged investigation was, at best, a feeble endeavor that could only have ensured preservation of the status quo. Their purported efforts simply do not satisfactorily discharge their fiduciary obligation to investigate and act upon allegations of corruption in their midst.

While respondents contend that they lacked the resources to conduct a more thorough investigation, it is apparent that respondents had at their disposal an array of possible responses that would have resulted in a true exploration of the allegations. They could have sought assistance from the authorities; obtained copies of the charges and proofs filed by the Investigations Officer against Patsy and Robert; arranged for a professional to conduct an in-depth interview of Patsy and Robert; or asked their advisors to investigate and develop the facts of the case for their review. In addition, the respondents, on their own, could have attempted to verify media reports tying Patsy and Robert to LCN, or they could have conducted substantive, in-depth questioning of Patsy, Robert and others having information about the allegations. The respondents instead opted for complete inaction.

Of course, this Court has previously noted that the respondents' "failure to employ any one investigative technique is not tantamount to a failure to investigate.... While [respondents'] fiduciary duty required some attempt to uncover the truth, had [they] acted, [they] enjoyed a fair amount of discretion in choosing appropriate methods." May 15, 1992 Opinion &

748

Order, *slip opinion* at p. 1354 (S.D.N.Y. 1992). The respondents, however, did have an obligation to probe into the veracity of the allegations by employing effective investigative measures. Their utter passivity in this situation reveals an alarming and glaring willingness to tolerate, and thus sanction, corruption in Local 27. This type of conduct "is a gross dereliction of [their] responsibility to the rank and file and, thus, a clear breach of [their] fiduciary duty." *Id.* at 1355.

### 2. Respondents' Attempt to Justify Inaction

 In an attempt to justify their utter inaction in this matter, the respondents assert that it would have been futile to conduct their own investigation. Because United States Attorneys Offices in the Southern District of Florida and the Southern District of New York, as well as the Department of Labor, investigated Patsy's and Robert's activities and never filed charges against them, the respondents contend that they had no duty to conduct a separate, independent investigation.

It is important to note that this argument does not support respondents' claim that they conducted an adequate investigation in this matter. Instead, their attempt to blame the Government is an excuse for complete inaction. Once the respondents knew of a threat to the rank and file's interests—this time in the form of LCN influence in Local 27—their duty as Union fiduciaries demanded that they take action. The conduct of third parties, including the Government, does not mitigate, replace or eliminate the duty of an IBT officer to serve the membership's interests by investigating and eradicating LCN influence in the IBT. As this Court noted in its May 15, 1992 order, "[i]f [respondents'] failure to act under the circumstances is accepted as the norm, nothing short of repeated intervention, whether it be by the government or the Court-appointed officers, would suffice to rid the IBT of its organized crime influences." *Id.* at 1355.

The failure of any Government agency to file charges against Patsy and Robert is not wholly irrelevant. The Government's decision not to file charges may have led respondents to believe that their investiga-

tion, had they conducted one, would result in absolving Patsy and Robert of any wrongdoing. The Government's decision, however, in no way excused respondents' "obligation as [fiduciaries] to investigate serious allegations of mob influence in the IBT. [Their] oath of office demanded that [they] undertake the investigation, even if [they] believed in [Patsy's and Robert's] innocence." *Id.* at 1356. The relevant issue is the respondents' obligation, not the Government's obligation.

Accordingly, this Court finds that the decision of the Independent Administrator is supported by substantial evidence, and is in no way arbitrary or capricious.

### III. CONCLUSION

IT IS HEREBY ORDERED that respondents' objections to the Independent Administrator's decision are denied; and

IT IS FURTHER ORDERED that the decision of the Independent Administrator is affirmed in its entirety; and

IT IS FURTHER ORDERED that the stay of penalties imposed by the Independent Administrator is dissolved, effective immediately.

SO ORDERED.