UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

In re APPLICATION CXIV OF THE INDEPENDENT ADMINISTRATOR.

No. 88 CIV. 4486 (DNE).

United States District Court, S.D. New York.

Aug. 11, 1993.

See also 829 F.Supp. 602.

Charles M. Carberry, Investigations Officer of the Intern. Broth. of Teamsters (Paul D. Kelly, of counsel).

Mary Jo White, U.S. Atty. for the S.D. of New York (Steven C. Bennett, Asst. U.S. Atty., of counsel), for U.S.

Asher, Gittler, Greenfield, Cohen & D'Alba, Ltd., Chicago, IL (Marvin Gittler, of counsel), for respondents William Raimondi and James Bertino.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by the plaintiff United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent

Decree"). The Consent Decree provides for three Court-appointed officials: the Independent Administrator to oversee the Consent Decree's remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer, who supervised the electoral process that culminated in the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the electoral and disciplinary provisions.

Application CXIV presents for this Court's review the decision of the Independent Administrator regarding disciplinary charges brought by the Investigations Officer against Mr. William Raimondi and Mr. James Bertino ("respondents"), respectively the former Vice President and Trustee/Business Agent of IBT Local Union 703, which is located in Chicago, Illinois. The Independent Administrator found that respondents brought reproach upon the IBT by failing to investigate and act when confronted with allegations that Mr. Dominic Senese ("Dominic"), a long-time officer of Local 703, was associated with organized crime.[1] Dominic died in January 1992. (Ind.Admin. Dec. at 3). For these violations of the IBT Constitution, the Independent Administrator barred Mr. Bertino and Mr. Raimondi from holding office in, or drawing any compensation from, any IBT-affiliated entity for a period of two years. The Independent Administrator permitted respondents to retain their IBT membership so that they can secure work, if they choose, as rank-and-file members with non-IBT affiliates. Furthermore, for the period of their suspension, the Independent Administrator precluded IBT-affiliated entities from making contributions on respondents' behalf to employment benefit plans, whether controlled by IBT-affiliates or third-parties, although the Independent Administrator did not alienate their vested benefits. Finally, the Independent Administrator prohibited any IBT-affiliated entity from paying respondents' legal expenses. The Independent Administrator stayed the imposition of penalties imposed on Mr. Bertino and Mr. Raimondi pending this Court's review.

Respondents contend that the proceedings before the Independent Administrator resulted in a deprivation of due process, and Mr. Bertino claims that laches bars the Investigations Officer's charge. Respondents further aver that the Independent Administrator's decision is arbitrary and capricious because it is not supported by substantial evidence. These arguments are without merit. For the reasons stated below, the decision of the Independent Administrator is affirmed.

## I. BACKGROUND: INDEPENDENT ADMINISTRATOR'S FINDINGS

The Investigations Officer charged that respondents brought reproach upon the IBT in violation of Article II, Section 2(a) and Article XIX, Sections 7(b)(1) and (2) of the IBT Constitution. Article II, Section 2(a) is the IBT membership oath, which provides in relevant part that every IBT member shall "conduct himself or herself at all times in such a manner as not to bring reproach upon the Union." Article XIX, Section 7(b) is a non-exhaustive list of disciplinary charges that may be filed against IBT members. Two such charges are: (1) violating the IBT Constitution, a Local Union Bylaw or other Union rule; and (2) violating the IBT membership oath. *See* IBT Const., Art. XIX, § 7(b)(1)–(2).

■ Pursuant to Section F.12(C) of the Consent Decree, the Independent Adminis-

---

1. The Investigations Officer also named in his charge, in addition to Mr. Bertino and Mr. Raimondi, Mr. Lucien Senese ("Lucien"), former Secretary–Treasurer of Local 703 and Dominic's son. The Independent Administrator found that the Investigations Officer had proved the charge filed against Mr. Senese, and as a penalty, the Independent Administrator permanently barred Mr. Senese from the IBT. In a letter dated May 7, 1993, counsel for Mr. Senese represented to the Court that Mr. Senese has opted not to ap-

peal the decision of the Independent Administrator. *Letter from Phillip A. Luetkehans, Counsel for Mr. Senese, to Honorable David N. Edelstein* (May 7, 1993) (on file in the Southern District of New York). The Independent Administrator's decision concerning the charges against Mr. Senese is neither arbitrary nor capricious. Accordingly, the Independent Administrator's decision, to the extent it concerns Lucien, is affirmed without further discussion.

trator must adjudicate disciplinary charges using a "just cause" standard. The Investigations Officer has the burden of establishing just cause by a preponderance of the evidence. *See* December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990). After conducting a hearing (the "hearing") at which respondents were represented by counsel, and after receiving post-hearing submissions, the Independent Administrator issued a twenty-six-page decision. The Independent Administrator found that the Investigations Officer satisfied his burden of proving that respondents brought reproach upon the Union by failing to investigate Dominic's alleged ties to organized crime. (Decision of the Independent Administrator ("Ind.Admin. Dec.") at 20–22).

## A. Dominic Was Associated with Organized Crime

The Independent Administrator found that Dominic was a member of La Cosa Nostra ("LCN"). The Independent Administrator noted that in his July 12, 1990 decision involving disciplinary charges filed against Dominic, he found that Dominic was a member of LCN. This Court, as well as the Second Circuit, affirmed the Independent Administrator's decision. August 27, 1990 Opinion & Order, 745 F.Supp. 908 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992). In that earlier proceeding, the Investigations Officer offered the sworn declaration of Federal Bureau of Investigation ("FBI") Special Agent Peter J. Wacks. Special Agent Wacks verified his earlier declaration at the hearing involving respondents. (Ind.Admin. Dec. at 4). In his declaration, Special Agent Wacks recounted evidence that Dominic was associated with LCN, including that "Senese has been identified by the FBI as a member of the Chicago Outfit." (Ind.Admin. Dec. at 4). In addition, Special Agent Wacks stated that former IBT General Presidents Roy Williams and Jackie Presser, as well as Angelo Lonardo, identified as an underboss of the Cleveland LCN, had identified Dominic as an LCN member. (Ind.Admin. Dec. at 5). Special Agent

Wacks also noted that on January 21, 1988, Dominic "was the victim of a mob-style murder attempt, by means of a shotgun blast to the head." (Ind.Admin. Dec. at 5). Because the Independent Administrator found Special Agents Wacks a credible witness who gave reliable testimony, the Independent Administrator found that Dominic was associated with organized crime. (Ind.Admin. Dec. at 5).

## B. Respondents' Knowledge of Allegations Concerning Dominic's Association with Organized Crime

The Independent Administrator found that Mr. Raimondi became a member of Local 703 in 1978 and was appointed Vice President of the Local by Dominic in 1983. Although originally a part-time position, Mr. Raimondi became full-time Vice President in 1987. He retained this post until 1989, when he lost an election bid to unseat Lucien as the Local's Secretary–Treasurer. (Ind.Admin. Dec. at 6). Mr. Raimondi asserts that in addition to campaigning for the post of Secretary–Treasurer, he organized an entire slate of candidates to challenge the incumbent Local 703 officers, including Dominic and Lucien. *Respondents' Memo*, at 7–8. In the course of the campaign, respondents distributed to the membership of Local 703 literature concerning Dominic's ties to LCN. (Ind.Admin. Dec. at 22–23); *Respondents' Memo*, at 8–12. After failing in his quest to secure the Secretary–Treasurer position, the FBI informed Mr. Raimondi of a death threat against him. In September 1990, Mr. Raimondi resigned from Local 703 and was appointed an Organizer/Business Agent of IBT Local 738. (Ind.Admin. Dec. at 7).

The Independent Administrator found that Mr. Raimondi knew of the allegations concerning Dominic's association with LCN. The Independent Administrator reasoned that Mr. Raimondi admitted hearing rumors of Dominic's LCN connections prior to the 1988 assassination attempt and he also acknowledged reading newspaper articles on the subject.[2] (Ind.Admin. Dec. at 10); *Re-*

---

2. Mr. Raimondi asserts that he learned of these allegations only after the assassination attempt

on Dominic, in early 1988, and not before the assassination attempt, as the Independent Ad-

*spondents Raimondi's and Bertino's Opposition to Application of the Independent Administrator* (Respondents' Memo, at 5). Indeed, the Investigations Officer offered fifty newspaper articles, spanning a thirty year period beginning in 1961, that contained allegations linking Dominic to LCN. In late 1979 for example, and again in late 1983, both the Chicago Sun–Times and the Chicago Tribune ran several articles containing such allegations. (Ind.Admin. Dec. at 10–12).

Mr. Bertino became a member of Local 703 in 1967, and in 1978 he became a Trustee of the Local. He remained in this position until December 1984, when Dominic and Lucien Senese compelled his resignation. Although he remained a Local 703 Organizer/Business Agent from 1984 until he left the Local in December 1989, Mr. Bertino's union membership was revoked by Dominic and Lucien in August 1988. (Ind.Admin. Dec. at 7). In December 1989, Mr. Bertino resigned from Local 703 and began working as an Organizer/Business Agent at IBT Local 738. In 1991, Mr. Bertino became, and still is, Recording Secretary at Local 738. On his own time, he assisted Mr. Raimondi's campaign for Secretary–Treasurer. After that election, Mr. Bertino, like Mr. Raimondi, was informed by the FBI of a death threat against him. (Ind.Admin. Dec. at 8). The Independent Administrator found that while a Trustee of Local 703, Mr. Bertino knew of the allegations linking Dominic to LCN. The Independent Administrator based this conclusion on Mr. Bertino's admission that he read newspaper articles containing such allegations. (Ind.Admin. Dec. at 10–12).

### C. Respondents' Failure to Act in Response to the Allegations Linking Dominic to LCN

The Independent Administrator found that "Raimondi's failure to investigate is undisputed.... [His] testimony and admissions make clear that he never investigated Senese." (Ind.Admin. Dec. at 19). The Independent Administrator rejected Mr. Raimondi's contention that his electoral activities

were an acceptable substitute for investigating the allegations surrounding Dominic:

> The only certain conclusion to be drawn from [Raimondi's campaign efforts] is that Raimondi was well aware of the allegations surrounding [Dominic], and failed, as a member of the Local's Executive Board, to take adequate action in his capacity as a Union officer to address those allegations. While Raimondi claims that his actions were designed to rid the Local of Dominic Senese because of his LCN ties, there is another motivation that Raimondi ignores. I find that Raimondi simply wished to establish himself as the leader of the Local.

(Ind.Admin. Dec. at 20).

The Independent Administrator similarly concluded, and Mr. Bertino admitted, that he "took no action in response to the allegations that Dominic Senese was associated with organized crime." (Ind.Admin. Dec. at 20). Mr. Bertino asserted, however, that because he held no Executive Board or officer position with Local 703 following his forced resignation in December 1984 as a Trustee, he had no duty to investigate the allegations. In rejecting this contention, the Independent Administrator reasoned that Mr. Bertino knew of the allegations prior to his resignation as an officer in 1984. In addition, although Mr. Bertino contended that Dominic had stripped him of power even while he remained a Trustee of the Local, thus eviscerating his ability to conduct an investigation, the Independent Administrator found unpersuasive "Bertino's attempt to justify his inaction by suggesting that he was overshadowed by the very individual he was obligated to investigate.... The point is clear—once individuals accept the heavy responsibility of union office, they must be prepared to carry out all of their obligations." (Ind.Admin. Dec. at 21).

### II. DISCUSSION

#### A. Respondents' Due Process Rights Were Not Violated

Respondents contend that in bringing this charge, the Investigations Officer violat-

---

ministrator found. *Respondents' Memo,* at 5–6; (Ind.Admin. Dec. at 11–12). Even accepting Mr. Raimondi's assertion, he admittedly knew of the

allegations while an officer of Local 703. (Ind.Admin. Dec. at 11–12); *Respondents' Memo,* at 5.

ed the Consent Decree, which provides that "the person charged shall have at least thirty (30) days prior to hearing to prepare [a] defense." Consent Decree, § F.12(A)(b). Respondents reason that the Investigations Officer did not submit Special Agent Wacks' declaration until twenty-four hours before the hearing, and the Investigations Officer did not submit exhibits until forty-eight hours before the hearing. *Respondents' Memo*, at 18.

In their arguments, respondents omit that the Investigations Officer filed charges in this matter on September 18, 1992, while the hearing was not held until December 17, 1992. Therefore, respondents had three months to prepare for the hearing, which is sufficient under § F.12(A)(b) of the Consent Decree. As to the timing of the Investigations Officer's submissions, respondents do not allege that they sought pre-hearing production of the Investigations Officer's evidence, nor did they attempt to obtain information through a subpoena.[3] Moreover, respondents acknowledge that although the Independent Administrator offered to continue the hearing, they declined the offer and instead chose to proceed with the hearing. This Court has held that where the Independent Administrator offers to continue a hearing in response to a complaint over inadequate preparation time, such an "offer alone eliminate[s] any possible prejudice." August 27, 1990 Opinion & Order, 745 F.Supp. 908, 914 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992). The Independent Administrator's offer to continue the hearing undermines respondents' conclusory allegations of prejudice. Respondents' willingness to proceed with the hearing despite the Independent Administrator's offer of a *continuance* suggests that respondents were not genuinely seeking more time to prepare a defense—a concern that certainly would have been addressed by a continuance—but instead were primarily interested in manufacturing a basis for appeal.

■ Mr. Bertino has proffered a second due process argument. He contends that he "had absolutely no notice at the time he was an officer that he would be required to defend in this forum. In effect, the application of the Consent Decree to conduct occurring prior to December, 1984 is, in a real sense another violation of due process." *Respondents' Memo*, at 20 n. 9. The Investigations Officer's charge, however, did not subject Mr. Bertino to some new form of discipline: In signing the Consent Decree, the IBT "merely exercised its discretionary authority under the [IBT] Constitution to delegate the investigation and discipline of union misconduct to the court-appointed officers." *United States v. IBT*, 905 F.2d 610, 623 (2d Cir. 1990). Mr. Bertino's argument, therefore, is reduced to an objection to litigating in this forum. The Second Circuit, however, has held that this Court has authority under the All Writs Act, 28 U.S.C. § 1651, to enjoin litigation in any forum other than the Southern District of New York, and to compel the litigation in this District, of all issues implicating the Consent Decree. *See United States v. IBT*, 907 F.2d 277, 280–81 (2d Cir. 1990). Accordingly, Mr. Bertino suffered no deprivation of due process by being compelled to address in this forum charges filed under the Consent Decree based upon pre-Consent Decree conduct.

### B. Laches Does Not Bar the Charge Against Mr. Bertino

■ Mr. Bertino contends that this Court should dismiss the charge against him because "more than eight years after he ceased being an officer, [in December 1984, when Dominic compelled his resignation as a Trustee], he was charged with failing to act in a certain manner while an officer." *Respondents' Memo*, at 20.

■ "The existence of laches is a question addressed to the discretion of the trial court," which must consider the "equities of the parties." *Gardner v. Panama R.R. Co.*, 342 U.S. 29, 30–31, 72 S.Ct. 12, 13, 96 L.Ed.

---

3. Upon seeking a subpoena from the Independent Administrator, Lucien was informed that the Consent Decree does not endow the Independent Administrator with subpoena power. Although the Independent Administrator directed Lucien to apply to this Court should he wish to seek relief, (Ind.Admin. Dec. at 17 n. 13), Lucien failed to petition this Court for a subpoena.

31 (1951). Laches bars a claim where it is clear that a plaintiff unreasonably delayed in initiating action and this delay prejudiced the defendant. *See King v. Innovation Books,* 976 F.2d 824, 832 (2d Cir.1992); *Robins Island Preservation Fund, Inc. v. Southold Dev. Corp.,* 959 F.2d 409, 423 (2d Cir.1992); *Stone v. Williams,* 873 F.2d 620, 623–25 (2d Cir.1989). Prejudice results when a delay "makes it difficult to garner evidence," or where a "change in position" makes it inequitable to allow plaintiff's claim to proceed. *Robins Island,* 959 F.2d at 424.

■ Mr. Bertino bases his laches defense on the passage of time alone: Because he resigned in December 1984 and the charges were not filed until September 1992, Mr. Bertino suggests that the Investigations Officer's charge is time-barred. Charitably, Mr. Bertino's argument addresses the first prong of a laches analysis—whether the Investigations Officer waited an unreasonable period before filing charges. Nevertheless, the contention is without merit because "it is the reasonableness of the delay rather than the number of years that elapse which is the focus of the inquiry." *Stone,* 873 F.2d at 624. This Court finds that the Investigations Officer did not unreasonably delay in bringing these charges. Mr. Bertino's suggested time frame, which begins in December 1984, is misleading, because the Consent Decree, which created the position of Investigations Officer, did not exist until March 1989. Given that no such individual existed, the Investigations Officer could not have brought this charge before early 1989. *See, e.g., Stone,* 873 F.2d at 624 (delay of six years in bringing action not unreasonable). Moreover, the Investigations Officer had ample justification for not filing charges against Mr. Bertino until September 1992: Despite limited resources, the Investigations Officer has filed charges against over two hundred IBT members. Simultaneous initiation of actions against all these individuals obviously was not practicable.

As to the second prong of the laches analysis, Mr. Bertino has not even alleged that prejudice resulted from the timing of the Investigations Officer's charge. Mr. Bertino has not, for example, contended that the intervening years since his resignation have hindered his ability to defend the Investigations Officer's charge. Indeed, it is difficult for this Court to fathom how the passage of time would affect Mr. Bertino's defense, given that he admits not investigating the allegations concerning Dominic's ties to LCN. Likewise, his proffered excuse for inaction—that he had no authority to investigate—is as unavailing now as it would have been eight years ago. In addition, Mr. Bertino has not alleged that his circumstances have changed since his resignation such that allowing the Investigations Officer's charge would be unfair. The absence, then, of a showing of either unreasonable delay or prejudice is fatal to Mr. Bertino's laches argument.

■ Possibly in an attempt to bolster a weak argument, Mr. Bertino cites Section D.5 of the Consent Decree, which prohibits IBT-affiliated entities from filing disciplinary charges more than five years after "the discovery of the conduct giving rise to the charge." Consent Decree, § D.5. Although Mr. Bertino acknowledges that "[t]his limitation period shall not apply to any actions taken by the Investigations Officer or the Administrator," *id.,* he urges that the five-year statute of limitations guide this Court's assessment of the laches defense. Accepting respondent's argument, however, implies disregarding the intent of the drafters of the Consent Decree. By freeing the Independent Administrator and the Investigations Officer from the five-year statute of limitations, the drafters of the Consent Decree—the IBT and the Government—expressed a clear desire not to hinder the Independent Administrator and the Investigations Officer with a time limitation. An exemption for these Court–Appointed Officers is logical given that their positions did not exist until March 1989. When resolving disputed language in a consent decree, the decree "should be interpreted in a way that gives effect to what the parties have agreed to, as reflected in the judgment itself." *SEC v. Levine,* 881 F.2d 1165, 1179 (2d Cir.1989). Equating a successful laches defense with a five-year limitations period effectively binds the Independent Administrator and the Investigations Officer to the five-year rule, thus

eviscerating the exemption that the drafters of the Consent Decree created for them.

### C. The Independent Administrator's Decision Is Supported by Sufficient Evidence

Respondents argue that the Independent Administrator's decision is arbitrary and capricious because they allegedly took appropriate action under the circumstances. In support of this contention, respondents aver that their duty to investigate and act in response to allegations of corruption within the union serves the larger aim of eradicating corruption from the IBT. Respondents contend that they attempted to realize this goal, and thus discharged their fiduciary obligations, by organizing an electoral challenge to the incumbent officer slate, which included Dominic and Lucien. According to respondents, mounting such a challenge "was the most appropriate means of purging Local 703 of the incumbent administration which was the subject of the allegations of improper association." *Respondents' Memo*, at 22. Respondents add that they lacked the authority, skill and resources to conduct a meaningful investigation into Dominic's organized crime connections.

In reviewing decisions of the Independent Administrator, it is well settled that the findings of the Independent Administrator "are entitled to great deference." *United States v. IBT*, 905 F.2d 610, 616 (2d Cir.1990), *aff'g*, March 13, 1990 Opinion & Order, 743 F.Supp. 155 (S.D.N.Y.1990). This Court will overturn the findings of the Independent Administrator when it determines that they are, on the basis of all the evidence, "arbitrary or capricious." *United States v. IBT*, 981 F.2d 1362, 1368 (2d Cir.1992); *United States v. IBT*, 978 F.2d 68, 71 (2d Cir.1992); August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); March 13, 1990 Opinion & Order, 743 F.Supp. 155, 165 (S.D.N.Y.), *aff'd*, 905 F.2d 610 (2d Cir.1990); *see* July 13, 1993 Opinion & Order, 826 F.Supp. 749 (S.D.N.Y.1993); June 22, 1993 Opinion & Order, 824 F.Supp. 410 (S.D.N.Y. June 22, 1993); March 5, 1993

Opinion & Order, 817 F.Supp. 337, 341–42 (S.D.N.Y.1993); February 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1175–76 (S.D.N.Y. 1993); December 10, 1992 Opinion & Order, 808 F.Supp. 279, 281–82 (S.D.N.Y.1992); July 14 Opinion & Order, 803 F.Supp. 748, 753–55 (S.D.N.Y.1992); July 13 Opinion & Order, 803 F.Supp. 740, 745–46 (S.D.N.Y.1992); July 9, 1992 Opinion & Order, 803 F.Supp. 734, 737–38 (S.D.N.Y.1992); May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1353 (S.D.N.Y. 1992); April 27, 1992 Memorandum & Order, 791 F.Supp. 421, 425 (S.D.N.Y.1992); February 11, 1992 Memorandum & Order, 787 F.Supp. 345, 350 (S.D.N.Y.), *aff'd*, 978 F.2d 68 (2d Cir.1992); January 20, 1992 Memorandum & Order, 782 F.Supp. 256, 259 (S.D.N.Y. 1992); January 16, 1992 Memorandum & Order, 782 F.Supp. 238, 241 (S.D.N.Y.), *aff'd*, 978 F.2d 706 (2d Cir.1992); November 8, 1991 Memorandum & Order, *slip op.* at 4–5, 1991 WL 243268 (S.D.N.Y.1991); October 29, 1991 Opinion & Order, 776 F.Supp. 144, 152–53 (S.D.N.Y.1991), *aff'd*, 954 F.2d 801 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); October 25, 1991, Order, *slip op.* at 4–5 (S.D.N.Y.1991); October 24, 1991 Memorandum & Order, 777 F.Supp. 1133, 1136 (S.D.N.Y.1991), *aff'd*, 970 F.2d 1132 (2d Cir.1992); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1132 (S.D.N.Y.1991), *aff'd*, 964 F.2d 1308 (2d Cir.1992); October 11, 1991 Memorandum & Order, 777 F.Supp. 1127, 1128 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1125 (S.D.N.Y.1991); August 14, 1991 Memorandum & Order, *slip op.* at 4, 1991 WL 161084 (S.D.N.Y.1991); July 31, 1991 Memorandum & Order, *slip op.* at 3–4, 1991 WL 150226 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); July 18, 1991 Memorandum & Order, *slip op.* at 3–4, 1991 WL 136030 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); July 16, 1991 Opinion & Order, *slip op.* at 3–4, 1991 WL 136029 (S.D.N.Y.1991); June 6, 1991 Opinion & Order, 775 F.Supp. 90, 93 (S.D.N.Y.), *aff'd in relevant part*, 948 F.2d 1278 (2d Cir.1991); May 13, 1991 Memorandum & Order, 764 F.Supp. 817, 820–21 (S.D.N.Y.1991); May 9, 1991 Memorandum & Order, 764 F.Supp. 797, 800 (S.D.N.Y.1991) *aff'd*, 956 F.2d 1161

(2d Cir.1992); May 6, 1991 Opinion & Order, 764 F.Supp. 787, 789 (S.D.N.Y.), *aff'd,* 940 F.2d 648 (2d Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191–92 (S.D.N.Y.1990); January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1045–57 (S.D.N.Y.), *aff'd,* 907 F.2d 277 (2d Cir.1990).

The Independent Administrator found that respondents breached their fiduciary duties by failing to investigate the allegations surrounding Dominic's LCN ties. In fact, the Independent Administrator found that Mr. Raimondi's and Mr. Bertino's failure to investigate was undisputed. (Ind.Admin. Dec. at 19–20). In addition, the Independent Administrator considered and rejected the argument that respondents have proffered to this Court—that they discharged their fiduciary obligations by organizing an electoral challenge to Dominic and Lucien in the 1989 Local 703 election. The Independent Administrator found that personal ambition, rather than the welfare of the Local, motivated respondents' electoral activities. (Ind.Admin. Dec. at 20). The Independent Administrator also found that Mr. Bertino's efforts on behalf of Mr. Raimondi did not excuse his failure to investigate the allegations. (Ind.Admin. Dec. at 21).

 These findings are neither arbitrary nor capricious. The evidence supports the Independent Administrator's conclusion that respondents had a duty to act in response to the allegations, and that they failed to take appropriate action under the circumstances. As to whether respondents had a duty to act, it is now well settled that when confronted with allegations that an IBT officer is associated with organized crime, other officers and trustees of the Local must investigate and take appropriate remedial action. *See United States v. IBT,* 981 F.2d 1362, 1368 (2d Cir.1992), *aff'g* May 15, 1992 Opinion & Order, 792 F.Supp. 1346 (S.D.N.Y.1992); July 13, 1992 Opinion & Order, 803 F.Supp. 740, 746 (S.D.N.Y.1992). Mr. Raimondi and Mr. Bertino offer slightly different analyses of whether they knew of the allegations surrounding Dominic, and thus, whether they

had any duty to act. Mr. Raimondi does not dispute that while an officer of Local 703, he knew of the allegations surrounding Dominic. Although he quibbles with the precise moment he acquired such knowledge, the fact that he knew of the allegations while an officer triggers his fiduciary obligation to investigate and take remedial action. *See supra* at 7 n. 2.

 Mr. Bertino's position, at least in papers presented to this Court, is less clear. Before the Independent Administrator, Mr. Bertino argued that he did not know of the allegations while still a Trustee of Local 703, and thus, he had no duty to act in response to the allegations. The Independent Administrator rejected this contention, based on his finding that Mr. Bertino knew of the allegations in question. (Ind.Admin. Dec. at 11–12). Before this Court, Mr. Bertino maintains ignorance of the allegations while a Trustee of Local 703. Nevertheless, he has not formally raised or meaningfully addressed the issue of whether he had any duty to act in response to the allegations. Instead, Mr. Bertino argues that he took appropriate action under the circumstances. *Respondents' Memo,* at 21. Despite the murkiness of Mr. Bertino's position, it is clear that the evidence supports the Independent Administrator's finding that while a Trustee of Local 703, Mr. Bertino knew of the allegations involving Dominic, and thus Mr. Bertino had a duty to act in response to the allegations. In his deposition before the Investigations Officer, Mr. Bertino admitted to reading the allegations about Dominic's LCN ties:

> Question: During the time that you were at Local 703 as a Trustee, did you ever hear allegations that Dominic Senese was connected to organized crime?

> Answer: Just what I read in the papers.

(Deposition of Mr. Bertino, at 6, lines 21–24). Indeed, given the sheer number of newspaper articles containing allegations of Dominic's mafia links, including those run in Chicago-based papers, it is inconceivable that Mr. Bertino would not have known of the allegations. Accordingly, the Independent Administrator's finding that Mr. Bertino knew of the allegations concerning Dominic's ties to

**618**

organized crime is neither arbitrary nor capricious.

 Given that respondents knew of the allegations surrounding Dominic, and thus had a duty to act, the only remaining issue is whether they breached their fiduciary obligations by failing to take appropriate action. Mr. Bertino and Mr. Raimondi suggest that they responded appropriately to the allegations by organizing an electoral challenge to Lucien and Dominic. They argue that victory for the challengers would have resulted in the removal of Lucien and Dominic from office, thus realizing the goal of eradicating corrupt influences from the IBT. In effect, respondents aver that a union officer discharges his or her duty to act in response to allegations of corruption by taking any action that may, directly or indirectly, result in the removal from office of the subject of the allegations. This argument is not persuasive. Forgetting for the moment issues of fairness to the subject of the allegations, perhaps respondents believe that they could have discharged their fiduciary obligations by dropping a penny in a well and wishing for Dominic's removal from office.

 Without minimizing the value of honest and competitive elections, it is wholly inappropriate for an IBT officer to respond to allegations of corruption solely by seeking the removal of the subject of the allegations through electoral mechanisms. This Court has held, and the Second Circuit has affirmed, that in response to allegations of corruption, an officer's "fiduciary duty ... demand[s] a *specific type of reaction:* [He or she has] to investigate the veracity of the allegation ... and then take appropriate action." May 15, 1992 Opinion & Order, 792 F.Supp. at 1354 (emphasis added). It is true, of course, that " 'failure to employ any one investigative technique is not tantamount to a failure to investigate.... [H]ad [they] acted, [respondents] enjoyed a fair amount of discretion in choosing appropriate methods.' " July 13, 1992 Opinion & Order, 803 F.Supp. 740, 747–48 (S.D.N.Y.1992) (quoting May 15, 1992 Opinion & Order, 792 F.Supp. at 1354). Nevertheless, regardless of methodology, respondents had to undertake an inquiry into the allegations. Their undisputed failure to do this constitutes a breach of fiduciary duty.

The rationale for requiring an IBT officer to conduct an investigation when confronted with allegations of corruption—as opposed to opting for some other course of conduct—is rooted in the beneficial byproducts produced by an investigation. Conducting an inquiry reveals the truth or falsity of the allegations, which is in the interest of all law-abiding IBT members, including the subject of the allegations should the allegations prove false. The damage inflicted on the truth-seeking process when officers act without undertaking an investigation is manifest in this matter. Because respondents did not probe the veracity of the allegations, they had no basis to assess whether the allegations justified even attempting to procure Dominic's removal from union office through electoral mechanisms. Given respondents' ignorance, their election activities represent not a legitimate method of uncovering and disciplining wrongdoing within the Local, but are more accurately seen either as vigilantism or a quest to satisfy personal ambition by attaining a higher union office.

 In addition, should allegations of misconduct prove true, IBT officers have at their disposal a host of penalties that differ in severity. Indeed, the IBT Constitution subjects to discipline IBT members who knowingly associate with organized crime. IBT Const., Art. XIX, § 7(b)(9). That the IBT Constitution contains no uniform penalty applicable to this transgression is hardly surprising: penalties vary according to the unique facts of differing situations. Assessing an appropriate penalty requires knowledge that can be obtained only through a thorough investigation of the allegations. Admittedly, "knowing association" is an extraordinarily serious charge that warrants permanent banishment from the IBT. *See, e.g.,* April 27, 1992 Memorandum & Order, 791 F.Supp. 421, 423 (S.D.N.Y.1992) (IBT member permanently banished from union for knowingly associating with organized crime); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1131 (S.D.N.Y.1991) (same), *aff'd,* 964 F.2d 1308 (2d Cir.1992); May 9, 1991 Memorandum & Order, 764

F.Supp. 797, 799 (S.D.N.Y.1991) (same), *aff'd*, 956 F.2d 1161 (2d Cir.1992); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 192–93 (S.D.N.Y.1990) (same). Nevertheless, when an IBT officer is subject to allegations of a different type of misconduct, seeking that officer's removal without inquiring into the allegations risks imposition of an inappropriate penalty.

 Furthermore, IBT officers are bound to serve the interests of the general membership, which has an immense interest in a Union that is free of LCN influence. *See* May 15, 1992 Opinion & Order, 792 F.Supp. at 1353. Therefore, union officers must attempt to uncover and eradicate organized crime influence within the IBT in the most expeditious and effective manner possible. *See id.* Organizing a slate of opposition candidates and running for election is an extremely drawn-out process, devoid of a crucial truth-seeking component, that is not guaranteed to result in any sanction, let alone an appropriate penalty, should the allegations prove true.

Finally, institutional concerns demand an investigation when an IBT officer is confronted with allegations of corruption. Governance by process, rather than rule by diktat, fosters a sense of fairness and reason. *Cf. Stein v. New York*, 346 U.S. 156, 200, 73 S.Ct. 1077, 1100, 97 L.Ed. 1522 (1953) (Frankfurter, J., dissenting) (exclusionary rule designed to deter unlawful police practices, and thus, rule bars even reliable evidence "not out of tenderness for the accused but because we have reached a certain stage of civilization"). By investigating allegations of corruption, rather than unilaterally assessing their veracity and imposing punishment, a union official promotes an atmosphere of lawfulness within the IBT. Such conduct thus advances the goal, contained in the Consent Decree, that the IBT "be maintained democratically, with integrity and for the sole benefit of its members and without unlawful outside influence." Consent Decree, at Sixth "Whereas" Clause. Similarly, conducting an investigation promotes the "general membership's free and active exercise of their Union rights." May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1353 (S.D.N.Y.), *aff'd*, 981 F.2d 1362 (2d Cir.1992). Despite respondents' protestations, their myopic pursuit of electoral victory was not a proper exercise of their fiduciary obligations. Even if it results in the removal from office of an allegedly corrupt IBT officer, pursuing electoral office is not a substitute for a meaningful inquiry into the allegations.

While respondents claim they lacked the resources and authority to conduct a meaningful investigation, a more in-depth examination of possible responses belies their claim. For instance, respondents could have referred the matter, and given any required assistance, to law enforcement authorities, representatives of the International Union or the Court–Appointed Officers. In addition, respondents or their advisors could have questioned Dominic about the allegations. These investigative avenues require neither money nor authority, but rather the desire to discharge fiduciary duties by investigating and acting in response to allegations of mafia influence in the IBT. Moreover, respondents' claim that they lacked the resources to investigate the allegations is further undermined by their having possessed sufficient resources to wage an election campaign. Indeed, conducting an inquiry consumes far fewer resources than an electoral challenge to an incumbent slate of union officials.

 Finally, respondents repeatedly note that in waging an election campaign, they educated the rank and file about Dominic's LCN ties, and thus discharged their fiduciary obligations. This argument is without merit. Because respondents failed to investigate allegations of corruption within Local 703, they breached their duty and are subject to internal union discipline. Nevertheless, their election activities impact on the magnitude of the misconduct. The Independent Administrator found that "through campaigning, [respondents sought] to educate the rank and file.... In addition, both men paid a price for their efforts, having been informed by the FBI of death threats against them. As such, substantial mitigation of their penalty is warranted." (Ind.Admin. Dec. at 22–23). The Independent Administrator then barred respondents from obtaining employment with any IBT-affiliated entity for a period of two-years, which is a far less severe penalty than that imposed on other IBT officers charged with similar abdi-

cations of fiduciary responsibility. *See, e.g.,* July 13, 1993 Opinion & Order, 998 F.2d 120, 122 (S.D.N.Y.1993) (officer permanently barred from holding union office due to failure to investigate allegations of wrongdoing and for improperly causing the Local to pay his and another member's legal fees); July 14, 1992 Opinion & Order, 803 F.Supp. 748, 753–54 (S.D.N.Y.1992) (officer who failed to investigate allegations that another officer had LCN ties was permanently barred from holding office in any IBT-affiliated entity); July 13, 1992 Opinion & Order, 803 F.Supp. 740, 742 (S.D.N.Y.1992) (officers who failed to investigate allegations of wrongdoing by two other officers permanently barred from IBT); May 15, 1992 Opinion & Order, 792 F.Supp. 1346 (S.D.N.Y.) (officer who failed to investigate allegations of corruption by a fellow officer permanently barred from holding union office), *aff'd,* 981 F.2d 1362 (2d Cir. 1992). The Independent Administrator's finding that respondents breached their fiduciary obligations, but that their conduct entitles them to a relatively mild sanction, is fully supported by the evidence.[4]

### III. CONCLUSION

For the reasons stated above, respondents' objections to the Independent Administrator's decision are DENIED. The decision of the Independent Administrator is AFFIRMED IN ITS ENTIRETY. In addition, the stay of penalties imposed by the Independent Administrator is DISSOLVED, effective immediately.

SO ORDERED

**4.** Although not clear from their papers, respondents apparently challenge the Independent Administrator's reliance on Special Agent Wacks' declaration. *Respondents' Memo,* at 27–28. It is well settled that reliable hearsay evidence is admissible in IBT disciplinary proceedings. *United States v. IBT,* 978 F.2d 68, 72 (2d Cir.1992); January 16, 1992 Memorandum & Order, 782 F.Supp. 238, 242 (S.D.N.Y.), *aff'd,* 978 F.2d 706 (2d Cir.1992); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1133 (S.D.N.Y. 1991), *aff'd,* 964 F.2d 1308 (2d Cir.1992). Special Agent Wacks' testimony is reliable. Respondents' counsel had the opportunity to cross-examine Special Agent Wacks. Moreover, Mr. Wacks has worked with the FBI for over twenty-seven years as a Special Agent, and since 1971, he has been particularly involved in investigating organized crime influence within the IBT. In addition, Special Agent Wacks' statements contain a detailed description of Dominic's ties to LCN. Having examined Special Agent Wacks' statements, in light of his background and expertise in this area, this Court agrees with the Independent Administrator that "[Special] Agent Wacks is a credible witness and his testimony is reliable." (Ind.Admin. Dec. at 5).